**James Roy KNOX, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 71,981.**

Court of Criminal Appeals of Texas.

Nov. 20, 1996.

Douglas A. Broch, Houston, for appellant.

B. Warren Goodson, Jr., Asst. Dist. Atty., Galveston, Matthew Paul, State's Atty., Austin, for state.

## OPINION

WHITE, Judge.

Appellant was convicted of the offense of murder in the course of committing aggravated robbery or robbery. Tex. Penal Code Ann. § 19.03(a)(2). The jury answered the special issues and punishment was assessed accordingly at death. Tex.Code Crim.Proc.

Ann. art. 37.071(b).[1] Appeal to this Court is automatic. Art. 37.071(h). Appellant raises five points of error. We will affirm.

In appellant's first point of error, he argues that his right to a speedy trial, guaranteed by the Sixth Amendment to the U.S. Constitution,[2] was abrogated by the 403-day delay between the Fifth Circuit mandate granting habeas relief unless a retrial was conducted and the trial date originally ordered by the federal district court.[3] For purposes of resolving this issue we set forth the procedural history of this case in some detail.

### History

Appellant was first convicted of the instant offense on December 5, 1985. This court affirmed the conviction. *Knox v. State,* 744 S.W.2d 53 (Tex.Cr.App.1987), *cert. denied,* 486 U.S. 1061, 108 S.Ct. 2834, 100 L.Ed.2d 934 (1988). Appellant's state habeas petition was also denied.

Appellant next filed a federal habeas petition which was denied by the federal district court. On March 28, 1991, the Fifth Circuit reversed the district court's ruling and remanded the case to the federal district court "with directions to grant the writ of habeas corpus, unless the State of Texas conducts a new penalty phase determination[4] within a reasonable time." *Knox v. Collins,* 928 F.2d 657, 662 (5th Cir.1991). The mandate for this ruling issued on April 19, 1991.

On November 8, 1991, appellant filed a motion with the federal district court asking it to enforce the Fifth Circuit mandate urging that the district court grant his habeas relief because the State court had not yet retried him. The State responded that the Fifth Circuit mandate impliedly left the responsibility to the district court to set "a reasonable time" in which a retrial should begin because the mandate was directed to the federal district court only.[5] Therefore, the State argued, because appellant did not move to enforce the mandate earlier, appellant had created the delay himself.

At the February 22, 1992, hearing on appellant's motion, the federal district court agreed with appellant that the Fifth Circuit mandate did not require an additional order from the district court setting a time limit for a new trial to begin. However, the district court also ruled that the ten-month time period between the issuance of the mandate and the hearing on appellant's motion did not violate appellant's Sixth Amendment right to a speedy trial. On February 26, 1992, the district court issued an order denying appellant's motion to grant habeas and requiring the State to begin retrial within ninety days.[6]

---

1. Unless otherwise indicated, all references to articles are to those in the Texas Code of Criminal Procedure.

2. Appellant also claims his rights were violated under Article I § 10 of the Texas Constitution; however, because he presents no argument or authority as to why the Texas Constitution should afford him any more protection than the federal constitution, appellant has inadequately briefed his state constitutional claim. However, we further note that although our state constitutional speedy trial right is independent of the federal guarantee, we have held nonetheless that a balancing test identical to the one established in *Barker v. Wingo, infra,* is to be used in determining whether a defendant has been denied his state speedy trial right. *Harris v. State,* 827 S.W.2d 949, 956 (Tex.Cr.App.1992).

3. Appellant's first conviction for the instant offense occurred on December 5, 1985. The mandate from the Fifth Circuit reversing and remanding the case to the federal district court occurred on April 19, 1991. On February 26, 1992, the federal district court ordered a retrial.

Appellant does not appear to complain about the period of time from 1985 to 1991, but only notes that the delay of his retrial appears more egregious when considered in light of the date of his first conviction.

4. The law applicable to the instant case did not permit the conducting of a new "penalty determination" alone. Remand for punishment only in a capital case was not authorized until the 1991 regular legislative session. Acts 1991, 72nd Leg., ch. 838, p. 2900, Sec. 2, eff. Sept. 1, 1991; *see also* Article 44.29.

5. The State conceded that it had made a decision to retry appellant in May 1991, but did not proceed due to its interpretation of the federal mandate.

6. Appellant immediately moved to stay the order which was granted by the district court. *Knox v. Collins,* No. G–88–382 (S.D.Tex. March 26, 1992). Appellant then appealed the ruling to the Fifth Circuit. On appeal, the Fifth Circuit affirmed. *Knox v. Collins,* 999 F.2d 824 (5th Cir.

*Knox v. Collins,* No. G–88–382 (S.D.Tex. Feb. 26, 1992).

### Analysis

■ There is no defined period of time that has been held to be a *per se* violation of a defendant's right to a speedy trial under the Sixth Amendment. *Barker v. Wingo,* 407 U.S. 514, 529–30, 92 S.Ct. 2182, 2191–92, 33 L.Ed.2d 101 (1972); *Emery v. State,* 881 S.W.2d 702, 708 (Tex.Cr.App.1994). Each case is considered on its own merits and the reviewing court must consider four factors: the length of the delay, the reason for the delay, the defendant's assertion of the right, and the prejudice to the defendant resulting from the delay. *Id.* at 530, 92 S.Ct. at 2191; *Emery,* 881 S.W.2d at 708.

■ We first note that appellant cannot legitimately claim that the ninety-day period set out by the district court to begin a retrial is part of the delay. Appellant had the February 26th order stayed, thereby preventing the State from going forward with the trial. Therefore, appellant can only complain of a ten-month delay.[7] The length of the delay is to some extent a triggering mechanism, so that a speedy trial claim will not be heard until passage of a period of time that is, *prima facie,* unreasonable under the existing circumstances. *Id.* We will assume *arguendo* that the ten-month delay here was, *prima facie,* unreasonable under the circumstances. *See* 2 LaFave & Israel, Criminal Procedure Sec. 18.2(b) (1984) (courts generally hold that any delay of eight months or longer is presumptively unreasonable and triggers speedy trial analysis).

■ Next, the State maintains that it in good faith believed that the State court did not have authority to proceed with the in-stant case without an order from the district court. This issue was argued before both the district court and Fifth Circuit. Although the federal courts held that the March 28, 1991 mandate was self-executing, *Knox,* 999 F.2d at 826, we do not conclude that the State postponed the trial in bad faith.

With regard to the third factor, appellant moved the federal district court to grant habeas because the State had not retried him within a "reasonable time." Therefore, appellant asserted that the State had violated his right to a speedy trial. However, we note that his motive in waiting 203 days to file this motion was to obtain the default granting of his habeas corpus application. It was to appellant's advantage *not* to move for a speedy trial. *See Harris v. State,* 827 S.W.2d 949, 957 (Tex.Cr.App.1992).

■ The final factor of prejudice must be assessed in the light of the defendants' interests which the speedy trial right was designed to protect: (1) to prevent oppressive pretrial incarceration; (2) to minimize anxiety and concern of the accused; and (3) to limit the possibility that the defense will be impaired. *Barker,* 407 U.S. at 532, 92 S.Ct. at 2193. The first and second interests are, of course, applicable to appellant, as they would be to any defendant, but there is no evidence in the record that the third interest is implicated in this case at all.

Appellant does not present any evidence that his defense was prejudiced by the complained-of delay.[8] On appeal, he asserts that "[t]here was a strong likelihood that [his] mother would be unable to testify, and that several mitigation witnesses who testified at [his] first trial were unavailable." However, appellant also concedes that he purposefully did not present any mitigation witnesses at

---

1993). The court specifically held that its previous mandate was self-executing, but that "a reasonable time" was not limited to ninety days. *Id.* at 825–26. Further, the court held that appellant had "not established an unreasonable delay in the constitutional sense" and the district court had not abused its discretion. *Id.* at 826. Certiorari was denied on January 10, 1994. *Knox v. Collins,* 510 U.S. 1061, 114 S.Ct. 732, 126 L.Ed.2d 696 (1994). The stay was lifted by agreed motion on March 8, 1994, giving the State until June 7, 1994, to begin retrial. The

instant trial began on May 31, 1994. Appellant does not complain about the delay of the trial until 1994 that he created by his choice to appeal the February 26th order.

7. The period of time from the Fifth Circuit's March 28, 1991 ruling and the February 26th district court order.

8. The defendant has the initial burden to make a showing of prejudice. *Emery,* 881 S.W.2d at 709.

the instant trial. Therefore, appellant cannot show the delay harmed him in any manner.[9]

Balancing the factors set forth in *Barker,* we agree with the federal courts that appellant was not deprived of his right to a speedy trial. *Knox,* 999 F.2d at 826 (appellant "has not established an unreasonable delay in the constitutional sense."). Point of error number one is overruled.

In his second point of error, appellant maintains that the trial court erred in admitting evidence of appellant's prior drug use at the guilt/innocence phase of trial. During trial, the State sought to introduce evidence of appellant's prior drug use in order to prove motive because the case was based on circumstantial evidence. The State believed the issue of motive, or "Why would somebody in Alabama plan to rob a drug store in Galveston?," would be seriously contested. Appellant objected to the admission of the evidence as irrelevant and as "prior bad acts" under "the Texas Rules of Evidence." We will assume that appellant was objecting under Rules 401 and 404(b) of the Texas Rules of Evidence.

Evidence is "relevant" if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tex. R.Crim. Evid. 401. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. Tex.R.Crim. Evid. 404(b). It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided, upon timely request by the accused, reasonable notice is given in advance of trial of intent to introduce in the State's case-in-chief such evidence other than that arising in the same transaction. *Id.*

■ Whether objected-to evidence of "other crimes, wrongs, or acts" has relevance apart from character conformity, as required by Rule 404(b), *supra,* is a question for the trial court. *Montgomery v. State,* 810 S.W.2d 372, 391 (Tex.Cr.App.1990)(opinion on rehearing). In *Montgomery,* we stated the following in establishing guidelines for reviewing the trial court's decision whether evidence is relevant under Rule 404(b):

> ... appellate courts uphold the trial court's ruling on appeal absent an 'abuse of discretion.' That is to say, as long as the trial court's ruling was at least within the zone of reasonable disagreement, the appellate court will not intercede. The trial court's ruling is not, however, unreviewable. Where the appellate court can say with confidence that by no reasonable perception of common experience can it be concluded that proffered evidence has a tendency to make the existence of a fact of consequence more or less probable than it would otherwise be, then can it be said the trial court abused its discretion to admit that evidence. Moreover, when it is clear to the appellate court that what was perceived by the trial court as common experience is really no more than the operation of a common prejudice, not borne out in reason, the trial court has abused its discretion.

*Id.* at 391.

In the instant case, the trial court heard arguments regarding the extraneous offenses outside of the jury's presence. The trial court then determined that the evidence of appellant's drug use was relevant to prove motive.[10]

■ The record supports the trial court's ruling. Evidence of appellant's use of drugs

---

Appellant's counsel argues that appellant's decision not to present mitigation witnesses was "not rational." However, our role is not to weigh the reasonableness of appellant's decisions in presenting his defense. We can only weigh what is before us in the trial record.

10. Although the existence of a motive is not essential to a conviction, nevertheless the pres-

ence or absence of a motive for a crime is obviously a factor that is related to the question of the defendant's guilt or innocence. Consequently, proof of any existing motive for the offense is generally held admissible, especially in cases where the state is forced to rely on circumstantial evidence alone.
24 Tex.Jur.3d, Sec. 3019, Criminal Law.

tends to prove appellant's motive in robbing the victims at Joe's Pharmacy for drugs. Unlike the two cases cited by appellant,[11] there is an affirmative link between the underlying offense of robbery and appellant's use of narcotics. Because appellant had voiced his desire to obtain drugs and money from this particular pharmacy, the complained of evidence establishes the motive for the charged offense. The trial court did not abuse its discretion. *See Montgomery, supra.* Point of error two is overruled.

█ In points of error three and four, appellant contends that the evidence is insufficient to sustain his conviction generally and under the accomplice-witness rule. He specifically contends that the evidence at his trial was insufficient to corroborate the testimony of the accomplice witnesses, George Holland and Gary Morgan.[12] He argues that the non-accomplice evidence is not sufficient to connect him to the crime. *See* article 38.14. We disagree.

Viewed in the light most favorable to the verdict, the evidence at trial established the following:

### Eye-Witness Testimony

At approximately 5:30 p.m. on November 10, 1982, the victim, a pharmacist, and his assistant, Ronald Dale Dyda, were getting ready to close Joe's Pharmacy Center for the day when a man appeared at the counter. Dyda described the man as being about six feet tall, white, unshaven, and with a thin build. The man pointed a small, dark semi-automatic pistol at them and demanded money and drugs. He told them to "get down on the floor." Dyda complied, but the victim did not. The victim told the man that they did not have drugs there and that the man would not get away with it. The perpetrator was not swayed.

The robber gave Dyda some medical tape and told him to tie the victim's hands. However, the victim kept pulling his hands apart so Dyda could not bind them. The man began to get angry. At this point the phone rang and the victim answered it. Dyda testified that the man again asked for the money, but the victim prevented him from giving it to the man.

Joanne Seelbach was on the other end of the phone line. She testified that the victim answered the phone as usual,[13] but then she heard him repeat, "He don't know where the dope's at" three times. After she heard the victim say to take the money, she heard another male voice say, "I want the God damn dope." The victim again repeated, "He don't know where the dope's at." Seelbach then testified that she heard the unidentified male voice say, "You son-of-a-bitch I am going to kill you." She then heard a shot and the male voice state, "Now you will give me the dope you son-of-a-bitch." She then hung up the phone to call the police.

Meanwhile, after the victim had answered the phone, the robber told Dyda once again to tie the victim's hands. The victim again successfully resisted. The robber got angrier, told them to get behind the counter, and threatened to kill them both. When Dyda turned to go behind the counter, he heard a gun shot. He turned and saw that the victim

11. Appellant cites this court to *Powell v. State,* 478 S.W.2d 95 (Tex.Cr.App.1972); and *Bush v. State,* 628 S.W.2d 441 (Tex.Cr.App.1982), in which we held that the use of extraneous offenses to show motive was in error. In *Powell,* the defendant was indicted for the theft of two lawnmowers. This Court held that the attenuated line of reasoning used by the trial court—Powell's drug use required money, therefore, Powell stole the lawnmowers to obtain money to support his drug habit—was an abuse of discretion. In *Bush,* the defendant was indicted for the capital murder of a police officer. The context of the murder occurred during a robbery. This Court held that although Bush's drug use showed a motive for the robbery, Bush was not indicted for the robbery. Therefore, the drug use was inadmissible as motive for an unindicted extraneous offense. Neither *Powell* nor *Bush* is applicable to the instant case.

12. An accomplice witness is a discredited witness whose testimony, without corroboration, will not support a conviction. *Walker v. State,* 615 S.W.2d 728, 731 (Tex.Cr.App.1981). Both appellant and the State concede Holland and Morgan are accomplices to the crime. Further, the trial court instructed the jury on accomplice-witness testimony.

13. Seelbach was a long-time customer of the pharmacy and was familiar with the victim's voice.

had fallen behind the dispensing counter into a blue curtain. Dyda testified that the victim never acted aggressively or resisted the man physically.

The robber then pointed the gun at Dyda and demanded the money and "class A" drugs.[14] In response, Dyda gave the robber four small brown bottles of Demorol and the money from the cash register. The robber then asked if there were more drugs. Dyda replied that there were and when he retrieved some to put on the counter, the robber had already fled. The victim died shortly thereafter of a gunshot wound to the midchest that perforated his heart and severed his spine. The bullet came from either a .38–caliber or 9mm gun.

Also at approximately 5:30 p.m. that day, Kathleen Austin, Gene Austin, and Robert Clarac were sitting and talking at the catering shop next door to Joe's Pharmacy Center when they heard a loud bang. All three went outside because they thought the noise came from someone hitting a car in the back parking lot.

Kathleen and Clarac went out the front door and down the alley between the pharmacy and the catering shop towards the back parking lot. Kathleen noticed that a car was in the lot with its motor running. The car was old, dark brown, and had a light colored top. Having seen no damage to her vehicle, she started back to the front of the building when a man came running around the corner from the direction of Joe's Pharmacy Center. She described the man as about six feet tall with a thin build, unshaven and scraggly-looking with medium brown hair. After almost running into Kathleen, the man said "Have a nice day" and then walked on. Kathleen further testified that the man had his left hand up under his shirt and about three brown bottles in his right hand. She thought it was unusual that the pharmacist had let someone take their prescriptions without putting them in a bag. Consequently, she went to check on the pharmacist and

found that he had been shot. Clarac testified that he observed the same events.

Gene Austin, who had gone out the back door of the catering shop, also described the man and the car in the same manner as Kathleen and Clarac. Gene further testified that there was a driver waiting behind the wheel of the car and further saw the unshaven man get into the passenger seat of the car. The car then drove off in a westerly direction. After learning that the victim had been shot, Gene attempted to follow the brown car but it was too late.[15]

*Accomplice Testimony*

George Holland, the confessed driver of the dark brown car, testified that in October of 1982 appellant discussed with him, Gary Morgan, and Robert Clark the possibility of robbing the employees of a certain drug store in Galveston, Texas. The four were in Alabama at the time. He testified that appellant said the robbery would be a "piece of cake" because there were no cameras in the store. Appellant had formerly resided in Galveston in 1981. Appellant further stated that the purpose of the robbery would be to obtain drugs and money. Holland also testified that he had seen appellant with a small, dark gray semi-automatic .38–caliber pistol.

Not long after this discussion, Gary Morgan went to Houston with Ed Duke to work installing carpet in a department store. A few days later, in November of 1982, appellant and Holland followed. Holland testified that they were driving his brother-in-law's 1972 dark brown Chevrolet with a cream colored top. Upon arriving in Houston, they went to stay at Ed Duke's where Morgan was also staying.

After meeting up with Morgan and his girlfriend, Sandra, appellant, Holland, Morgan, and Sandra drove to Galveston. On the way, Holland testified that appellant again discussed robbing the drug store. When they arrived in Galveston, the group drove to Joe's Pharmacy. Gary and Sandra went inside to see if any cameras had been installed

---

**14.** Dyda testified that "class A" narcotics are controlled substances that have the highest potential for abuse such as Demorol, Dilaudid, and morphine.

**15.** Appellant and his accomplices, *see infra*, were not apprehended until two years later. None of the eye-witnesses were able at that time to positively identify the perpetrators.

since appellant had last been there. They had not. Meanwhile, appellant and Holland waited in the car. After learning about the lack of security, the foursome went to drink beer and appellant discussed his plan: he would rob the store employees and Holland would drive the car. Sandra testified that she went to walk along the beach while the men had this discussion. The foursome then returned to Houston.

The next day, appellant and Holland again went to Galveston. They sat around drinking beer until the sun began to go down. The two then went to the pharmacy. Holland waited out in the back parking lot of the store and appellant went inside. Holland testified that appellant took longer than he expected and when he returned, he directed Holland to leave a certain way. As they were leaving, Holland stated he saw people coming around the side of the building. Appellant then got on the floorboard of the car and directed Holland on how to get out of Galveston. Holland noticed appellant had possession of about three brown pill bottles.

As they were leaving Galveston, Holland testified that appellant said, "The man got ignorant with me. I had to shoot him." When Holland asked him "how bad," appellant replied, "I killed the motherfucker." Holland then informed appellant that appellant had to get out of his car and "find some other way around." Holland testified that appellant had assured him that no one would get hurt during the robbery. He dropped appellant off on the mainland and called Gary Morgan to pick up appellant and take him to a bus station. Holland then left for Alabama.

Gary Morgan also testified that appellant had previously discussed a robbery at a drug store and that he, Sandra, Holland, and appellant had driven down to Galveston to confirm the store's lack of security the day prior to the robbery. He further testified that the day of the robbery, Holland phoned him and asked him to meet him at a bar. When Morgan arrived, Holland told him that he and appellant had committed the robbery and that Holland wanted him to pick up the appellant because he had left him down the road. Morgan agreed.

Morgan drove to where Holland stated that he had left appellant. Morgan pulled over and pretended to have car trouble. He opened the hood of his car and had taken "the breather off the car" when appellant ran up. Appellant had some small brown pill bottles with him, so Morgan told him to put them into the breather. The two then drove to a service station where appellant proceeded to shave off his beard leaving only a mustache. Morgan testified that prior to this appellant had a shaggy-looking beard and was not well-groomed.

Morgan testified that appellant told him that he had used his gun while committing the robbery. Appellant stated that he had attempted to tape the man up, but that the man had broken the tape each time. Appellant then told him that when the man reached for his back pocket, appellant shot him and the man fell back into some curtains. Appellant also stated that he got the bottles of drugs from the boy that was left at the counter and that the boy was too scared to know what to do. Morgan drove appellant to the bus station. Once there, appellant took the bottles from the breather of the car and gave two to Morgan along with some money. Morgan testified that he told appellant that he did not want it, but appellant gave it to him anyway. Morgan left appellant at the station and when he got home he hid the bottles in his car and later took them back to Alabama as appellant requested.

### Other Evidence

Walter Robert Clark, a friend of appellant's in Alabama, testified that appellant had talked to him about robbing the employees of a drug store in Galveston. Appellant told him that he wanted money and "class A" drugs and that the robbery would be easy. Clark testified that he told appellant that the robbery was a bad idea because a drug store would not have a large stock of "class A" drugs. Appellant and Holland left for Galveston anyway. Clark stayed in Alabama.

About a week later, appellant returned to Alabama. Appellant told Clark that he had robbed a pharmacist in Galveston for some Demorol and had to shoot a man. The Demorol was in little brown bottles. Clark

testified that he knew appellant owned a small, dark .38–caliber automatic pistol; however, appellant told him that he buried the gun. Appellant also told Clark that Holland drove the car during the robbery, but Holland had put him out of the car and Morgan had to come pick him up. Clark further stated that when Morgan arrived back in Alabama, he brought over more Demorol which had been hidden in his car.

Appellant's cellmate after his arrest in November of 1984, Carroll Bernard Smith, also testified at trial. Smith stated that appellant told him about committing the robbery in Galveston. Appellant related that he had tied-up the person's hands, but when the man reached for the front of his pants, appellant shot him. Appellant stated that he had obtained "class A" narcotics and that he had someone waiting outside in a car. Appellant further told Smith that he and the waiting driver drove to some half-way point where he buried the gun and from there a second party took him back to south Houston where he stated he "did another job."

Finally, Kathy Pressletz, appellant's former roommate, testified. Pressletz stated that she and appellant were roommates in Galveston during the summer of 1981. Appellant was familiar with Joe's Pharmacy Center and had told her that it would "be easy to knock off." Pressletz interpreted this to mean "rob."

### Analysis

In reviewing a sufficiency question, we must view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Gribble v. State,* 808 S.W.2d 65, 73 (Tex.Cr.App.1990), *cert. denied,* 501 U.S. 1232, 111 S.Ct. 2856, 115 L.Ed.2d 1023 (1991). The sufficiency of the evidence to sustain appellant's conviction is determined by evaluating the probative weight of all the evidence that the trial judge permitted the jury to consider, including erroneously admitted evidence. *Gribble,* 808 S.W.2d at 68.

■ The evidence shows that appellant admitted his participation in the robbery and the killing of the victim. Morgan and Holland both testified that they assisted appellant in some way. Dyda, the Austins, and Clarac each described a perpetrator that looked like appellant. The Austins and Clarac also described the car driven by Holland. Further, appellant was in possession of three to four small brown pill bottles containing Demorol. We hold that the evidence was sufficient to support appellant's conviction for capital murder. Point of error four is overruled.

■ Turning now to appellant's contention that the evidence at his trial was insufficient to corroborate the testimony of the accomplice witnesses, we observe that article 38.14 provides:

A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense.

To determine whether an accomplice's testimony is corroborated, we eliminate the accomplice testimony and review the remaining evidence to determine whether it tends to connect appellant to the offense. *Munoz v. State,* 853 S.W.2d 558, 559 (Tex.Cr.App.1993). Further, we have stated:

Corroborative evidence need not establish appellant's guilt of the charged offense nor directly link appellant to the offense, but is sufficient if it "tends to connect" appellant to the offense. Each case must be considered on its own facts and circumstances— on its own merit. Apparently insignificant incriminating circumstances may sometimes afford satisfactory evidence of corroboration.

*Id.* (citations omitted).

Viewed in the light most favorable to the verdict, the non-accomplice evidence in the instant case established that: (1) appellant was familiar with Joe's Pharmacy Center; (2) appellant had stated to Clark and Pressletz that he wanted to commit the robbery for

money and drugs and that it would be easy to do; (3) appellant had left Alabama and was in the Galveston area at the time of the crime; (4) appellant owned a small dark .38–caliber pistol; (5) the eye-witness descriptions describe appellant's appearance at the time of the crime; (6) Clark testified that appellant went to Texas with Holland; (7) Ed Duke testified that appellant and Holland stayed at his home in Houston the night before the murder, but they were gone the next day; (8) Sandra testified that she went to Galveston the day before the murder with appellant, Holland, and Morgan, and that she and Morgan checked Joe's Pharmacy for security cameras; (9) Clark testified that when appellant returned to Alabama he was in possession of small brown pill bottles containing Demorol; and (10) appellant told Clark and Smith that he had committed the robbery and shot the pharmacist, that Holland drove the car, and that Morgan had to pick him up after Holland put him out of the car.

In the instant case, the non-accomplice testimony places appellant in the company of the accomplice witnesses at the time of the offense. It further shows that he had a desire to commit the robbery, he had possession of a weapon of the type used in the murder, he had the opportunity to commit the murder,[16] he had possession of contraband of the type taken during the robbery, and he admitted his participation in the crime. After eliminating all the accomplice testimony from the record, we determine the other facts and circumstances in evidence tend to connect appellant to the offense and corroborate Holland's and Morgan's testimony. *See Colella v. State,* 915 S.W.2d 834, 839 (Tex.Cr.App.1995). Point of error three is overruled.

Finally, in his fifth point of error, appellant posits that the trial court erred in admitting evidence of certain unadjudicated extraneous offenses at the punishment phase of trial. Specifically, he contends that the State did not sufficiently connect him to the offenses or prove that the offenses actually occurred. *See Kemp v. State,* 846 S.W.2d 289, 307 (Tex. Cr.App.1992).

At trial, appellant objected only that the State did not completely comply with Article 37.07 § 3(g) regarding certain notice requirements.[17] Appellant made no objections to the admission of the offenses either to the bench or before the jury. Because his trial objection does not comport with the issue raised on appeal, he has not preserved anything for our review. Tex.R.App.Proc. 52(a); *Barnes v. State,* 876 S.W.2d 316, 325 (Tex.Cr. App.), *cert. denied,* —— U.S. ——, 115 S.Ct. 174, 130 L.Ed.2d 110 (1994); *Johnson v. State,* 803 S.W.2d 272, 293 (Tex.Cr.App.1990).

The judgment of the trial court is affirmed.

---

16. An accused's opportunity to commit the offense may be a suspicious circumstance. *Gill v. State,* 873 S.W.2d 45, 49 (Tex.Crim.App.1994).

17. Specifically, appellant objected that, although the State gave notice as to the particular offenses, the State did not give notice as to the date of each act and the counties in which they occurred. Article 37.07 § 3(g). The complained-of

evidence consisted of three witnesses stating that appellant bragged he had committed eleven or twelve other robberies, that he had lynched a man in Vidor, and that he had shot a man. Additionally, we further note that we have held that capital offenses are not governed by Article 37.07. *McFarland v. State,* 928 S.W.2d 482, 512 (Tex.Cr.App.1996).