**Affirmed and Memorandum Opinion filed July 10, 2012.**



In The

# Fourteenth Court of Appeals

_____

NO. 14-10-00438-CR
_____

**CLARENCE GREEN, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 228th District Court**
**Harris County, Texas**
**Trial Court Cause No. 1163776**

## MEMORANDUM OPINION

Clarence Green appeals his conviction for aggravated robbery, arguing that the evidence is insufficient to sustain his conviction and that the trial court reversibly erred in overruling his objection to the State's allegedly improper jury argument. Because the evidence is sufficient to sustain appellant's conviction and any error in overruling appellant's objection to the State's jury argument was harmless, we affirm.

# I. FACTUAL AND PROCEDURAL BACKGROUND

Myong Soon Lee owns and operates a beauty supply store in southwest Houston. On February 19, 2008, Lee was behind the register when two individuals, one male and one female, came into the store pointing guns and yelling "get down." Both robbers were wearing "hoodies" (hooded sweatshirts) and had their faces covered. The woman, who wore a gray hoodie and a bandanna over her face, ordered Lee's employees to a back room while the man, who wore a black hooded jacket and had his face covered with a stocking mask, held a gun to Lee's head and demanded all the money in the register. Lee gave the man all the cash she had, about $600–$700 in total. After the robbers left, Lee activated an alarm in her store that contacts the police in the event of a hold-up, and Officer Bob Conley of the Houston Police Department responded to the scene. According to Officer Conley, Lee described the female as black but gave virtually no description of the male except that he was wearing a hoodie around his face. The description Officer Conley recorded read "[u]nknown male, unknown age, didn't really give a height or weight." None of Lee's employees were able to give any further description of the male robber. The store has 16 security cameras, one of which captured images of two people approaching the store through an adjacent alley moments before the robbery. One of the people, who appears to be female, is shown wearing jeans and a gray hoodie and is depicted looking down, with her face not visible. The other, who is identifiably male, is shown wearing what appears to be a green hooded jacket over a black shirt or hoodie. The male's face is visible at a distance. Seconds later, internal cameras recorded the same woman, her face covered with a bandanna, pointing a gun at store employees and forcing them to the back of the store, while the register camera recorded a man wearing a black hooded coat holding a gun to Lee as she took cash from the register. In this recording, the man is looking down and his face is not visible.

About two months after the robbery, the police received a tip from an informant named Ashley Hudson. Hudson testified that on the night of the robbery, she, appellant, a female named Dishekaer Smith, and a male identified only as "Jahree" were driving

2

around the area near Lee's store when, "in the spur of the moment," they decided to rob it. Hudson pulled the car into an apartment complex and parked next to a wall adjoining the shopping center in which Lee's store is located. According to Hudson, appellant, Smith, and Jahree pulled on hoodies and wrapped bandannas around their faces, and appellant handed out guns. Appellant took a .38 caliber revolver with a silver barrel and light brown handle. Smith took a .25 caliber semiautomatic pistol, while Jahree took a black "Tech 9" automatic weapon. Appellant, Smith, and Jahree climbed over the adjoining wall while Hudson waited in the car. The three were gone less than fifteen minutes. When they returned, they carried a bag full of money. Back at appellant's apartment, the crew divided up the money. Hudson's share, which she estimated to contain less than those of the other robbers, came to something less than $200. At trial, Hudson identified the man shown in the external surveillance video as appellant and the female as Smith.

The police began to look for appellant and found that he was wanted under a number of outstanding municipal warrants for traffic violations. The police spotted appellant's car and pulled him over. Appellant was driving, with Smith in the front passenger seat. Appellant consented to let the police search his car, and they found a black knit stocking cap or ski mask in the back cargo area along with three baseball hats, cellular phones, and other personal items. The police asked appellant for permission to search his apartment, which he granted. In a bedroom, they found several guns, including a .25 caliber semiautomatic pistol and .38 caliber revolver with a light brown handle and silver barrel. They also found more cellular phones, bandannas, and a number of black hoodies.

The police contacted Lee and asked her to view a live lineup consisting of appellant and five other black males of similar descriptions. The men were told to wrap bandannas around their faces and say "get down." Lee, who speaks broken English, was accompanied by her son. Lee's son interpreted as the officers read Lee instructions and asked her to identify a suspect. Lee brought footage from her store's security cameras to the lineup and looked at it periodically to aid in identifying the robber. Lee identified appellant as the robber and appellant was charged with aggravated robbery.

3

Before trial, appellant moved to suppress all "evidence of identification by any witness from any third party witness who may have been present at any show-up or line-up proceeding or photograph identification proceeding." The trial court denied this motion. At trial, before Lee identified appellant in court, an identification hearing was held outside the jury's presence. Lee testified at the hearing without an interpreter. She stated that although the male robber wore a black hoodie and his face was covered with a stocking cap, Lee could tell he was black because of "his voice, dress and complexion, his figure" and added that "[b]ecause the stocking mask was so thin, I could see his face. I could tell very clearly the man and I could tell between man and woman." She further noted that she had told the police that the robber was "skinny" and carried a small silver-colored gun. Lee also discussed the lineup she had attended some two months after the robbery. Her testimony about this lineup is riddled with contradictions and appears to suffer from the lack of an interpreter. Asked if she had been told that the suspected perpetrator might not be in the lineup, Lee responded "No," but she later said that the officer administering the lineup "might have said, but I would not understand him." Lee stated that she had understood she was "to pick out the most closest one." When asked, "did you believe that was the person who robbed you?" she replied, "Yes." But when asked, "So, in other words, you're not sure if [appellant] is the suspect?" Lee responded that she was "not quite certain" appellant was the robber, adding that she believed he was "because [she] saw it through the camera" she had brought to the lineup and "his complexion is very close."

Officer John Varela, who administered the lineup, also testified at the identification hearing. Officer Varela stated that he had read Lee the standard instructions for such lineups, which he read into the record as follows:

> In a moment you're going view a live lineup. The persons in the lineup may or may not be the person or persons who committed the crime now being investigated. Keep in mind that hairstyles, beards and mustaches may be easily changed. And also the lineup may not always depict the true complexion of a person. It may be lighter or—it may be lighter or darker. When you've seen the entire lineup, tell me whether or not you see the

4

person or persons who committed the crime.  Do not tell other witnesses that you have or have not identified anyone.

The trial court denied appellant's motion to suppress Lee's in-court identification.

The next day, Lee testified before the jury, this time with the aid of an interpreter. She identified appellant, without objection, as the robber.[1]  Regarding the line-up identification, Lee stated that she had discussed her prior testimony with her son and now recalled that she had not been told to identify "the closest one" but rather "the very one" who had robbed her.   She added that because of the lack of an interpreter the day before, she "was confused with the translation a little bit."   The following exchange then took place:

> [APPELLANT]: Now, was this the same son that you talked to last night that took her to the identification hearing or to the lineup?
>
> A. Yes.
>
> Q. Okay.   So, now, you remember yesterday saying that you were not certain that [appellant] was the suspect?
>
> A. Yes.
>
> Q. And you were testifying truthfully yesterday, correct?
>
> A. Yes.
>
> Q. Okay.   So, your testimony is then that you were not certain that this is the suspect.
>
> A. Right.

---

[1] On appeal, appellant does not challenge the admissibility of Lee's in-court or pretrial identifications.

5

Q. Okay. Now, when you came into the courtroom today, you saw [appellant] sitting at the counsel table, correct?

A. Yes.

Q. And he was seated next to me.

A. Yes.

Q. And you knew that you would be asked to identify this person, correct?

A. Yes.

Q. And there's —'cause there's no one else—there's no other black male sitting at counsel table, is there?

A. Correct.

Q. So, it's obvious then that he would be the person you would select, correct?

A. Yes.

. . . .

Q. Now, the bottom line is, ma'am, you don't really know who the robber was; is that correct?

A. No, that's not the case.

Q. But you're not certain that it was [appellant]?

A. Because I saw him through the video camera, that's why I said I'm not quite certain.

Q. You're not certain. All right. So, you think it might be him, but you're not certain?

A. Because it's a video camera.

Q. What?

A. The video—the video image is not clear. That's why I said it's not clear on him.

Q. Right. So, you're not certain that—what you're agreeing then is it could be somebody else?

A. I can't answer to that question.

At closing argument, appellant emphasized the problematic lineup at which Lee had identified appellant:

> Now, what this lady—this was a very nice lady. What does she want to do? She wants to please people. And that's normal. She's a nice lady. And what happens? She goes down to the police station. And I'm sure—just use your common sense. She had to be told in some way we've got a suspect. The suspect may be there. We think we know who he is. I'm sure that was communicated to her in some way. But an officer is not going to come in here and say they didn't follow the rules correctly. The means—the end justifies the means. I mean, they're going to—of course, they're going to say we just read it out to her the correct way and that was it. But just think, not only did she have trouble with English, her son was down there translating for her. So, I'm sure she felt she had to answer questions a certain way or pick somebody. I mean, just common sense.
>
> . . . .

7

And she thinks well, the police, they developed a suspect and they must have the right one.

. . . .

Now—now, I told you—I talked to you about human nature—human nature. People don't want to look embarrassed. They don't want to admit mistakes. All right. The officers that testified in this case, they don't want to make a mistake—don't want to admit they made a mistake or didn't follow the rules correctly. They're always going to say they did the proper thing. We have a suspect.

. . . .

But she wasn't certain. She picked out somebody she thought looked like him. She wanted to help. She wanted—she thought she was doing her duty. That's normal human nature. And the officers, normal human nature, helping her. They want to solve the case. They know who he is. That's why it's better to not have somebody that's involved in the case do the lineup and stuff. Because there won't be any outside forces, you know, telling the client or nudging you picked the right one or good or anything. There won't be any question about how valid it was, how fair it was.

The State responded to this argument in its own closing:

Let's also talk about this lineup. [Appellant] wants to talk to you about how the lineup was misleading and about how, you know, that maybe the officers were trying to mislead her, that it has created improperly [sic]. But don't you know that he didn't want you to see the lineup. He objected to it. And don't you know that if there was something so misleading on that lineup, that he would have wanted you to have seen it.

[APPELLANT]: Your Honor, we object to that. That's outside the record and also in bad faith.

THE COURT: Be overruled.

The jury convicted appellant of aggravated robbery and sentenced him to 99 years in prison. In two issues, appellant argues that (1) the evidence is insufficient to support his

8

conviction, and (2) the trial court reversibly erred in allowing the State to improperly bolster Lee's identification by inviting the jury to speculate about matters not in evidence in its closing argument.

## II. ANALYSIS

### A. Sufficiency of the Evidence

Appellant first challenges the sufficiency of the evidence to support his conviction. In evaluating challenges to the sufficiency of the evidence, we consider all the evidence in the light most favorable to the verdict. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979); *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010). If, when viewed in this light, any rational factfinder could have found the essential elements of the offense beyond a reasonable doubt, then the evidence is sufficient to support the verdict. *Jackson*, 443 U.S. at 319; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

Before a conviction may rest upon an accomplice witness's testimony, that testimony must be corroborated by other evidence tending to connect the accused with the crime. TEX. CODE CRIM. PROC. ANN. art 38.14 (West 2005). "To determine whether an accomplice's testimony is corroborated, we eliminate the accomplice testimony and review the remaining evidence to determine whether it *tends* to connect the defendant to the offense." *Nolley v. State*, 5 S.W.3d 850, 853 (Tex. App.—Houston [14th Dist.] 1999, no pet.) (citing *Knox v. State*, 934 S.W.2d 678, 686 (Tex. Crim. App. 1996)). To evaluate the sufficiency of the corroboration, we consider each case on its own facts and circumstances. *Id.* (citing *Munoz v. State*, 853 S.W.2d 558, 559 (Tex. Crim. App. 1993)). The corroborative evidence may be either circumstantial or direct and need not establish the defendant's guilt or directly link him to the charged offense; instead, it is sufficient if it "tends" to connect him to the offense. *Id.* (citing *Munoz*, 853 S.W.2d at 559, and *Gosch v. State*, 829 S.W.2d 775, 777 (Tex. Crim. App. 1991)). Although an accomplice witness may testify to any number of facts corroborated by other evidence, if the corroborated facts do not tend to connect the accused with the crime, the corroboration does not satisfy article

9

38.14. *Id.* (citing *Paulus v. State*, 633 S.W.2d 827, 843 (Tex. Crim. App. 1981)). If the corroborating evidence fails to connect the defendant with the charged offense, the evidence is insufficient to support the conviction. *Id.* (citing *Munoz*, 853 S.W.2d at 560). As in a general sufficiency review, we view the evidence in the light most favorable to the jury's verdict when evaluating the corroborative value of non-accomplice-witness testimony. *See Lacaze v. State*, 346 S.W.3d 113, 117 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd) (citing *Brown v. State*, 270 S.W.3d 564, 567 (Tex. Crim. App. 2008)).

Although appellant asserts a broad sufficiency challenge, his arguments are heavily focused on the non-accomplice-witness evidence. Appellant contends in just one sentence that Hudson herself "did not witness the robbery" but "merely drove the car, waited there, then later testified as to circumstances that made her believe that [appellant] committed robbery." While we agree that Hudson's testimony is circumstantial, it would nonetheless be sufficient to support appellant's conviction as long as it was corroborated by non-accomplice-witness testimony tending to connect appellant with the charged offense. *See Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) ("Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt."). Hudson testified that appellant suggested that the group rob Lee's store; handed out guns in the car (which broadly matched the witnesses' description of the guns used); pulled on a bandanna and hoodie; and returned less than 15 minutes later with a bag full of cash. This evidence—assuming it was corroborated by non-accomplice-witness testimony tending to connect appellant to the charged offense—is plainly sufficient to support appellant's conviction. Appellant does not seriously contest this point. Instead, appellant focuses on the sufficiency of the remaining evidence to corroborate Hudson's accomplice-witness testimony.

The evidence corroborating Hudson's testimony in this case is as follows:

- The beauty supply store's external camera recorded a man walking through an adjacent alley moments before the robbery. The man is shown wearing a green hooded jacket covering a black shirt or hoodie and is accompanied by a woman wearing a gray hoodie with a bandanna over her face. The same woman was recorded by interior surveillance videos moments later pointing a gun at the store's employees and ordering them to the back of the store. At the same time, the register camera recorded a man wearing a black hooded coat holding a gun to Lee as Lee handed him cash from the register.

- At trial, Lee identified the man in the external video as appellant, though she conceded that she was "not quite certain" because the video is somewhat unclear.

- Lee identified appellant at the pretrial lineup about two months after the robbery. Lee viewed her surveillance video to help her identify appellant, but also stated that she had been able to see through appellant's mask at the robbery because the mask was very thin. According to Officer Varela, Lee—with her son interpreting—was read a standard lineup instruction indicating that the suspect might not be present and that she should identify a suspect only if she believed him to be the perpetrator. Although she testified at the pretrial identification hearing that she understood she was to "pick the most closest one," Lee later testified—and was corroborated by Officer Varela—that she understood she was to pick "the very one" who had robbed her.

- Lee identified appellant in court as the robber, although she seemed at one point to accept appellant's suggestion that she had identified appellant because he was the only black man seated at the counsel's table.

- The guns that the police recovered at appellant's apartment matched the descriptions of those used in the robbery of Lee's store as described by Lee and her

employees in general terms (apart from Hudson's description of the weapons in greater detail).

Appellant contests the sufficiency of each piece of corroborative evidence in turn. With respect to the video recordings, appellant cites *Nolley* for the proposition that "presence at the scene of the crime is not sufficient to corroborate accomplice testimony." But the court in *Nolley* actually stated that "[a]lthough non-accomplice evidence that the accused was in the company of the accomplice at or near the time or place of the offense *is* proper corroborating evidence, such evidence *alone* is not *conclusive* corroboration." *Id.* at 854 (emphasis added). Rather, "[t]here must be *some* evidence which, when coupled with evidence which places the accused in the company of the accomplice at the time of the offense, tends to connect the accused to the commission of the crime." *Id.* (emphasis in original); *see also Jackson v. State*, 745 S.W.2d 4, 13 (Tex. Crim. App. 1988) (presence in company of accomplice near time of offense not alone conclusive, but important factor for corroboration). Here, the male perpetrator's face is visible on the store's external camera's recording taken shortly before the robbery. In her testimony, Lee identified appellant as the male perpetrator. The male perpetrator is also shown accompanying a woman, wearing a bandanna over her face and a gray hoodie, who is shown seconds later on an internal camera pointing a gun at Lee's employees and forcing them to the back of the store. At the same time, a male is shown on the register camera holding a gun to Lee as she takes cash from the register. In addition, the guns found in appellant's apartment matched the eyewitnesses' general descriptions of the guns used in the robbery. *See Hernandez v. State*, 939 S.W.2d 173, 178 (concluding that evidence was sufficient when it showed that appellant was present at the crime scene, had been in possession of a shotgun a few months before the robbery similar to that used in the robbery, and fled the scene without explanation); *Cockrum v. State*, 758 S.W.2d 577, 582 (Tex. Crim. App. 1988) ("Even evidence that a defendant had a gun which was merely similar to the murder weapon may corroborate accomplice testimony.").

12

Appellant argues that "[Lee's] in-court identification should be discarded outright, since [Lee] admitted on cross-examination that she identified [appellant] because he was sitting at counsel table." But appellant did not object to the in-court identification, nor did he obtain a ruling excluding it. The jury was not required to discard Lee's identification outright. Instead, the question is one of the weight of Lee's identification rather than its admissibility. Lee did seem at one point to accept appellant's argument that she had identified appellant because he was the only black man seated at the counsel's table, but through most of her testimony, she seemed to maintain that her identification was based on her viewing of the surveillance video and her own recollection of appellant's face as she could see it through his stocking mask. While Lee's identification was clearly not as credible as some identifications may be, we are not convinced that it was insufficient *as a matter of law* as tending to corroborate Hudson's testimony, particularly when taken in combination with other corroborative evidence. The issue is not whether Lee's identification independently establishes appellant's guilt but whether it "tends" to connect appellant with the charged offense. In making this determination, as noted above, we must take Lee's testimony in the light most favorable to the verdict and defer to the jury on its determination of her credibility. Viewed in this light, we conclude that Lee's in-court identification tends to connect appellant to the robbery and thus is sufficient—particularly when combined with the other corroborative evidence—to corroborate Hudson's testimony. *See Lacaze*, 346 S.W.3d at 113 (holding that eyewitness identification was sufficient to corroborate accomplice-witness-testimony where identifying eyewitness was "an admitted crack addict" and was able to make only a tentative identification of appellant when he viewed a photospread the first time because "we must defer to the jury on the credibility determination and assume that the jury found [the identifying witness] to be a credible witness in his identification"); *see also Brown*, 270 S.W.3d at 568 ("The fact that the testimony may have been subject to impeachment as coming from an admitted perjurer and drug user goes to the weight of the evidence and not to its admissibility.").

Viewed in the light most favorable to the verdict, the non-accomplice-witness testimony and physical evidence in this case "tends" to connect appellant with the charged offense. Taking the accomplice-witness testimony, the non-accomplice-witness testimony, and the physical evidence together—and viewing them all in the light most favorable to the verdict—we conclude that the evidence is sufficient to support appellant's conviction. We overrule appellant's first issue.

## B. Jury Argument

Next, appellant argues that the trial court erred in overruling his objection to the State's closing argument, in which the State told the jury that

> [appellant] wants to talk to you about how the lineup was misleading and about how, you know, that maybe the officers were trying to mislead her, that it has created improperly [sic]. But don't you know that he didn't want you to see the lineup. He objected to it. And don't you know that if there was something so misleading on that lineup, that he would have wanted you to have seen it.

The law provides for and assumes a fair trial, free from improper jury argument by the State. *Long v. State*, 823 S.W.2d 259, 267 (Tex. Crim. App. 1991). Jury argument is generally not considered improper if it encompasses one or more of the following areas: (1) a summation of the evidence presented at trial; (2) a reasonable deduction drawn from that evidence; (2) an answer to the opposing counsel's argument; or (4) a plea for law enforcement. *Guidry v. State*, 9 S.W.3d 133, 154 (Tex. Crim. App. 1999). To determine whether a party's argument falls within one of these categories, we must consider the argument in light of the entire record. *Wilson v. State*, 938 S.W.2d 57, 59 (Tex. Crim. App. 1996). To constitute reversible error, the argument must be extreme or manifestly improper, violate a mandatory statute, or have injected new facts into the proceedings that are harmful to the accused. *Martinez v. State*, 17 S.W.3d 677, 691 (Tex. Crim. App. 2000).

Even assuming, without deciding, that the trial court erred in overruling appellant's objection to the State's jury argument, the error did not affect appellant's substantial rights

14

and was therefore not sufficiently harmful to warrant reversal. *See Ortiz v. State*, 999 S.W.2d 600, 605–06 (Tex. App.—Houston [14th Dist.] 1999, no pet.) (argument inviting speculation about matters not in evidence is non-constitutional error for purposes of harm analysis); TEX. R. APP. P. 44.2(b) (non-constitutional error that does not affect substantial rights must be disregarded). In determining whether appellant's substantial rights were affected, we consider the following three factors: (1) the severity of the misconduct (the magnitude of the prejudicial effect), (2) any curative measures taken, and (3) the certainty of conviction absent the misconduct (the strength of the evidence supporting the conviction). *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998); *Martinez*, 17 S.W.3d at 692–93.

We first turn to the severity of the State's alleged misconduct. Appellant repeatedly insinuated that the police officers acted improperly in conducting the lineup; in effect, he asked the jurors to speculate about misconduct that nothing in the record indicated ever took place. While we do not necessarily agree with the State that the State's jury argument was therefore "invited error," we do agree that the State's jury argument did more to counter appellant's extra-evidentiary arguments than it did to introduce "new facts" harmful to appellant. Viewed against the backdrop of appellant's argument, the severity of the State's misconduct, if any, was not severe. As a consequence of this fact, the lack of curative measures taken in this case is less troubling than it may have been had the State's misconduct been more severe. Turning to the certainty of conviction absent the State's jury argument, as noted above, Hudson's testimony was corroborated not only by Lee's pretrial identification but also by Lee's in-court identification. It was also corroborated by Lee's identification of appellant as the man shown in the store's external surveillance camera; appellant's presence—as shown by the same camera—with the woman later shown on an internal camera pointing a gun at Lee's employees; the video recording of a man robbing Lee at the same time that the woman seen with appellant seconds earlier was in the store; and appellant's possession of weapons whose descriptions matched those used in the robbery. Taking into account the

15

severity of the State's alleged misconduct and the certainty of conviction absent any misconduct, we conclude that—notwithstanding the lack of curative measures taken—any error by the trial court in overruling appellant's objection to the State's jury argument did not affect appellant's substantial rights. Therefore, any such error would not be sufficiently harmful to require reversal. We overrule appellant's second issue.

## III. CONCLUSION

Having held that the evidence is sufficient to sustain appellant's conviction and any error in overruling his objection to State's jury argument was insufficiently harmful to require reversal, we affirm the trial court's judgment.


/s/     Tracy Christopher
        Justice


Panel consists of Justices Frost, Brown, and Christopher.

Do Not Publish — TEX. R. APP. P. 47.2(b).

16