TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-97-00096-CR






Paul Scott Ullrich, Appellant



v.



The State of Texas, Appellee







FROM THE DISTRICT COURT OF COMAL COUNTY, 22ND JUDICIAL DISTRICT


NO. CR96-019, HONORABLE JACK ROBISON, JUDGE PRESIDING







 Paul Scott Ullrich stabbed Ben Kiesling once, fatally. The jury found Ullrich used a deadly
weapon to commit murder. See Tex. Penal Code Ann. § 19.02(b)(2) (West 1994). The jury assessed
punishment at forty years in prison and a $10,000 fine. By ten points of error, Ullrich complains of his
counsel's ineffectiveness and of the court's admission of evidence, failure to award pre-sentence jail-time
credit, and award of restitution. We will reform the judgment by deleting the restitution award and affirm
the judgment as reformed.


BACKGROUND


 We must review the evidence even though Ullrich does not challenge its sufficiency. The
harmfulness of an erroneous admission of evidence is often apparent only in the context of all evidence
presented, particularly when the jury must consider charges on murder, manslaughter, aggravated assault,
and sudden passion.

 Relations between Ullrich and Kiesling were tense. Kiesling married Ullrich's ex-wife
Sandy and lived with her and Ullrich's children on a cul-de-sac. Ullrich testified that he was angry because
Sandy was not complying with his child visitation rights as set out in the divorce decree; he blamed Kiesling
for the visitation problems. Ullrich testified that he and Kiesling had many confrontations. He said Kiesling
threatened him with weapons and told him that, as a constable, he (Kiesling) could get away with such
actions. Ullrich said that on Father's Day 1995 when he was returning the children to Sandy, Kiesling
warned Ullrich to stay away from Sandy because Kiesling was a constable, had connections with the police
department, and could make Ullrich's life miserable. Ullrich said Kiesling also told him he had better not
ever catch Ullrich alone. When Ullrich started to respond, Sandy came out with a hidden tape recorder
and Kiesling calmed down. Ullrich was not calm on the tape. Amid a flurry of expletives, Ullrich accused
Kiesling of living off Ullrich's child support payments. The next Tuesday, when Ullrich showed up to make
arrangements to pick up his children for their standard visitation on Wednesday, Kiesling pointed a service
revolver at him. Ullrich restated his desire to arrange visitation; Kiesling came outside, pointed the gun at
Ullrich, and "said to get the F out of there or he would blow my head off or blow me away." Ullrich
related another incident when Kiesling flashed a handgun at Ullrich and Ullrich responded by pulling out
his .30/.30 rifle. Both men were known to carry weapons. Ullrich carried a knife in a scabbard; he had
owned the knife for more than twenty years. Kiesling kept a handgun underneath his truck seat when he
did not have it holstered as part of his constable's uniform.

 Witnesses other than Ullrich testified that Kiesling could be overly aggressive and
brandished weapons inappropriately. A police officer testified that he had once been called when Ullrich
claimed Kiesling pulled a gun on him. Lorraine Benjamin, Kiesling's ex-girlfriend, claimed Kiesling pulled
a loaded gun on her in 1994. A former co-worker at the Parks & Wildlife Department testified Kiesling
struck him on the legs with a police baton, causing great pain. (There was controverting evidence that this
incident was a prank.) Kiesling's former Parks & Wildlife supervisor testified that he had trouble with
Kiesling and that Kiesling illegally carried firearms while working for the department. Cindy Rodriguez, the
supervisor's wife, testified Kiesling attempted to enter their home while her husband was absent and when
thwarted threatened to kill her husband.

 Tensions between Ullrich and Kiesling grew on the weekend before the January 22, 1996
killing. On Friday, January 19, Ullrich was served with a protective order and notice of a hearing on a
restraining order; he took personal leave from work shortly thereafter. The record does not clearly set out
the terms of the protective order. Two days later, Ullrich admittedly was outside the Kieslings' house at
8:30 a.m., honking his truck's horn; Ullrich said he wanted his children to come out. He drove away
without them after Kiesling came outside. Kiesling complained to the police that Ullrich had violated the
protective order. Though Ullrich denied returning to the house after the 8:30 a.m. visit, one of the
Kieslings' neighbors said she later that day saw a small pickup pull into the Kieslings' driveway five or six
times in a three-hour period; none of the family's cars was around then. She said the driver honked the
horn repeatedly and stared at the Kieslings' house. At least once, the driver got out of the pickup and
banged on the side door of the Kieslings' house. Though she at first testified that the pickup was a red
sport-utility vehicle, she later identified a picture of Ullrich's gray pickup as the vehicle that had frequented
the cul-de-sac that day.

 At 6:00 on the morning of the killing, Ullrich called to take a personal day off work. He
said he intended to talk to his lawyer about the restraining order and the motion to modify. He testified that
he decided he and Kiesling needed to talk because Kiesling had called to harass him at 1:00 a.m. Ullrich
drove to a convenience store and waited for Kiesling to pass by. At about 7:30 a.m., Ullrich followed
Kiesling to a friend's house. Ullrich testified that he wanted only to talk to Kiesling, that he did not intend
to hurt, stab, or kill him. Ullrich said he did not know that his nine-year-old daughter Meredith was in the
truck with Kiesling.

 Meredith testified that Ullrich pulled his truck next to Kiesling's. Ullrich and Kiesling got
out of their trucks. Ullrich was talking, but Meredith could not hear him over the radio. As Kiesling got
out of the truck, she heard him say to Ullrich, "Get the hell out of here." Kiesling locked the truck door. 
Meredith did not see who started the fight; she covered her eyes and peeked only occasionally. Ullrich
testified that Kiesling said he and Sandy were going to make sure Ullrich never saw the children again. 
After Ullrich made an insulting remark concerning Kiesling's relationship with his own children, Kiesling
began hitting him repeatedly. Ullrich testified he crouched to fend off the blows from Kiesling who was six
inches taller than Ullrich; there was evidence that Ullrich's face and arms were bruised and abraded after
the confrontation. Ullrich said he feared for his life because he knew Kiesling carried a gun. He said he
saw Kiesling swing his coat back; believing Kiesling was reaching for a gun, Ullrich "panicked and reacted"
by drawing his knife and stabbing Kiesling once in the heart. Meredith said she did not see Kiesling reach
for a gun. Ullrich estimated three or four seconds passed from when he drew the knife to when he stabbed
Kiesling. Though he stabbed Kiesling in the torso, Ullrich said he had not aimed for any particular spot.

 Ullrich initially followed as Kiesling ran away, but stopped when the blood-stained Kiesling
turned and yelled for his friend to call 911. When the friend appeared, Ullrich turned to go to his truck and
for the first time saw Meredith sitting in Kiesling's vehicle. Ullrich transferred Meredith from Kiesling's
truck to his own. Meredith said she heard Kiesling call for help. She was scared Ullrich was going to hurt
her mother.

 As Ullrich drove Meredith to school, he threw the knife out the window. After leaving her
at school, he drove to his father's house and asked his father to drive him to the police station. Ullrich
surrendered and told officers where to find the bloody knife.


DISCUSSION


 The rules of appellate procedure set out different standards of review for different types
of errors in criminal cases. For constitutional errors subject to harmless error review, we must reverse the
judgment unless we determine beyond a reasonable doubt that the error did not contribute to the conviction
or punishment. Tex. R. App. P. 44.2(a) ("constitutional errors"). We must disregard any other error,
defect, irregularity, or variance that does not affect substantial rights. Tex. R. App. P. 44.2(b) ("common
errors"). A substantial right is affected when the error has a substantial and injurious effect or influence in
determining the jury's verdict. King v. State, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997).

Admission of evidence

 By his first six points of error, Ullrich challenges the admission of testimony regarding
defense investigator Johnny Rodriguez's opinion that Ullrich was stalking Kiesling before the killing. He
contends by his first two points that Lorraine Benjamin's testimony relating the stalking remark was
inadmissible hearsay and included inadmissible opinion testimony by a layperson. By his third point, Ullrich
contends that Rodriguez's testimony about his own opinion was inadmissible and prejudicial because
Rodriguez was not an expert on stalking. By the next three points, he contends the admission of all
testimony about Rodriguez's "stalking" remark violated his constitutional right to counsel by breaching the
attorney-client and work-product privileges. To determine whether error occurred, we review the court's
admission of the evidence for an abuse of discretion. Green v. State, 934 S.W.2d 92, 101-102 (Tex.
Crim. App. 1996). We will find error only if the court's decision was not within the "zone of reasonable
disagreement." Id. at 102.

 Evidence of Rodriguez's comments about stalking was first admitted during cross-examination of Lorraine Benjamin; Rodriguez reiterated the testimony later. At trial, Ullrich called
Kiesling's ex-girlfriend Benjamin to testify regarding an earlier altercation with Kiesling. Ullrich was
surprised and objected when the State asked Benjamin about defense investigator Rodriguez's stalking
remark. The court overruled Ullrich's objection and Benjamin refreshed her recollection by reviewing the
transcript of the tape recording she made of her conversation with Rodriguez. The following exchange then
occurred:


[PROSECUTOR]: When you asked Mr. Rodriguez, Johnny Rodriguez, what [Ullrich]
was doing on Highway 46 South that morning, what was his response?


[BENJAMIN]: He said, "He was following them. He was stalking them, basically." 



Benjamin explained that Rodriguez meant Ullrich was stalking his daughter and Kiesling. Rodriguez later
identified the voice on the tape as his own. His testimony showed that his comments came after Benjamin
wondered aloud why Ullrich was in a position to confront Kiesling. Benjamin agreed with Rodriguez that
Ullrich must have been following or stalking them.

 Ullrich contends that the trial court abused its discretion by allowing Benjamin's testimony
because it was inadmissible as hearsay and layperson opinion testimony. See Tex. R. Evid. 701, 801. (1) 
Under Rule 701, courts can allow lay witnesses to testify to their opinions only if the opinions are rationally
based on the witness's perception and help form a clear understanding of the witness's testimony or the
determination of a fact in issue. Rule of Evidence 801(e)(2) excludes from the definition of hearsay
admissions by a party-opponent offered against the admitting party; more particularly, it excludes
statements by the party's agent or servant made during the relationship concerning a matter within the scope
of the agency or employment. Tex. R. Evid. 801(e)(2)(D).

 The court did not abuse its discretion by overruling Ullrich's hearsay objection because the
statements are within the hearsay exception of Rule 801(e)(2)(D). The statements were offered against
Ullrich. Though Ullrich did not authorize Rodriguez to make such a statement, the rule does not require
that the party endorse or authorize the statements; the rule requires only that the comment be made during
the agency relationship and concern a matter within the scope of the employment. Rodriguez made the
stalking remark to Benjamin while investigating the case for Ullrich. The comment concerned the
investigation. The trial court did not abuse its discretion by determining that Benjamin's testimony was not
hearsay.

 Nor did the court abuse its discretion by overruling the objection to Benjamin's testimony
based on Rule 701. That rule excludes opinions by the witness, not opinions of others expressed to the
witness. Benjamin was not testifying as to her own opinions, but was recounting what Rodriguez told her.

 Finally, any error in the admission of Benjamin's testimony about Rodriguez's statement
was harmless; the opinion that Ullrich stalked Kiesling adds virtually nothing to the evidence in the record
when measured against the charge, which does not mention stalking. (2) There was ample evidence of a tense
relationship between Ullrich and Kiesling. Ullrich left work on a Friday when served with a restraining
order and motion to modify custody. Despite the restraining order, Ullrich admittedly went to the Kieslings'
house two days later, the day before the killing; a neighbor testified that Ullrich repeatedly drove by and
honked that day. The following Monday Ullrich again took off of work. He sat in his truck at a
convenience store and waited for Kiesling to pass by. When he did, Ullrich followed him, confronted him,
and killed him. Rodriguez's remarks add nothing substantial to this evidence.

 Once the testimony supporting the stalking remark and Benjamin's testimony were
admitted, any error in admitting Rodriguez's later testimony concerning those same comments was
harmless. The State might have invited Rodriguez to exceed the scope of Benjamin's testimony by asking
him, "So it is your personal opinion Scott Ullrich was stalking Ben Kiesling?" But Rodriguez stayed within
the scope of Benjamin's testimony by responding, "I would have to say that at the time that I was
investigating, based on what I had gathered, yes, that would have been an opinion that I gathered." 
(Emphasis supplied.) He thus avoided giving his present opinion and merely reiterated the statement
Benjamin introduced. We find no violation of substantial rights. We overrule points one through three.

 We now turn to points of error concerning the attorney-client and work-product privilege. 
The general attorney-client privilege covers confidential communications made for the purpose of facilitating
the rendition of professional legal services to the client. Tex. R. Evid. 503(b)(1). It reaches a
representative hired by the client's lawyer, such as an investigator. Id. A privilege special to criminal cases
allows the client to prevent a lawyer's representative from disclosing any fact that comes to the knowledge
of the lawyer's representative "by reason of the attorney-client relationship." See Tex. R. Evid. 503(b)(2). 
The work-product privilege generally shelters from discovery materials such as memoranda, reports,
interviews, mental impressions, conclusions, opinions, legal theories and other materials prepared and
assembled for litigation and in anticipation of litigation. Wood v. McCown, 784 S.W.2d 126, 128 (Tex.
App.--Austin 1990, no writ). It also applies in criminal cases. United States v. Nobles, 422 U.S. 225,
236 (1975).

 The trial court did not abuse its discretion by finding the Rodriguez-Benjamin conversation
outside the scope of the general attorney-client privilege. Benjamin was not within any category of
individuals with whom communications are protected by the privilege. Rodriguez's comments to her
arguably were not "confidential." Only confidential communications are protected by the attorney-client
privilege. A communication is confidential if not intended to be disclosed to third persons other than those
to whom disclosure is made in furtherance of rendering legal services to the client. See Tex. R. Evid.
503(b)(1). By making this statement to Benjamin, a person not embraced by the privilege, Rodriguez made
a disclosure that was not intended to be confidential.

 Nor did the trial court abuse its discretion by finding Rodriguez's remark outside the scope
of the special privilege. Courts distinguish between facts learned by reason of the attorney-client
relationship and facts learned during the attorney-client relationship. See Manning v. State, 766 S.W.2d
551, 556-58 (Tex. App.--Dallas) opinion adopted 773 S.W.2d 568, 569 (Tex. Crim. App. 1989). In
that case, Manning asserted the attorney-client privilege to prevent his former attorney from testifying
regarding Manning's competency to stand trial. Id. at 553. The court held that, if the attorney did not
reveal the substance of any confidential communications and testified only regarding the client's demeanor
and mental capacity, the attorney's testimony was not within the privilege. Id. at 557. The court held that
any person could have observed Manning's demeanor and "the happenstance that the observer was his
attorney does not mean that the observation arose 'by reason of the attorney-client relationship.'" Id. at
558. Here, no direct evidence shows that Rodriguez reached his stalking conclusion based on a
confidential communication. Nor does the record support Ullrich's assertion that a member of the jury
might believe that Rodriguez's statements arose from a confidential admission Ullrich made to Rodriguez. 
Rather, Rodriguez testified that he formed his opinion after interviewing six or seven subjects. There is no
indication that Ullrich was an interview subject or that he admitted stalking Kiesling. Also, Benjamin's
independent stalking conclusion underscores that one without access to confidential communications could
conclude that Ullrich was stalking Kiesling. The court did not abuse its discretion by rejecting the claim that
the attorney-client privilege barred testimony about Rodriguez's disclosure of his stalking conclusion to
Benjamin.

 We also find no error based on the rejection of the work-product privilege. Initially, we
note that Ullrich failed to raise this privilege at trial, failed to preserve error, and therefore waived appellate
relief. See Tex. R. App. P. 33.1(a). An objection based on the attorney-client privilege does not preserve
for appeal a claim based on the work-product doctrine. Carmona v. State, 941 S.W.2d 949, 953 (Tex.
Crim. App. 1997). Even were error preserved with regard to the admission of Rodriguez's testimony
about the conversation, we conclude beyond a reasonable doubt that it did not contribute to the conviction. 
Facts establishing Ullrich's stalking behavior were in evidence from other witnesses. We overrule points
four through six.


Extraneous offense evidence

 By point of error eight, Ullrich contends that the trial court erred by allowing the extraneous
offense testimony of William Holden at the guilt-innocence phase of the trial. Ullrich contends the evidence
was irrelevant, remote, and unduly prejudicial. We can reverse a court's erroneous admission of evidence
only for an abuse of discretion. Richardson v. State, 879 S.W.2d 874, 881 (Tex. Crim. App.1993), cert.
denied, 513 U.S. 1085 (1995) (Rule 403); Knox v. State, 934 S.W.2d 678, 682 (Tex. Crim. App. 1996)
(Rule 404(b)).

 The State called Holden to rebut testimony introduced by Ullrich painting Kiesling as an
aggressive, threatening man whose aggression Ullrich rebuked only in self-defense. After a hearing outside
the presence of the jury, the court concluded that Holden's testimony was relevant to rebut the defensive
theories that Ullrich merely defended himself from Kiesling's aggression. Holden testified about his April
1985 altercation with Ullrich about his driving. Sometime after 9:00 p.m., Holden turned onto a street
behind a car driven by Ullrich, whom he did not know. Holden noticed Ullrich "having a fit" shortly after
they made the turn. Ullrich swerved to the roadside and Holden pulled up beside him. He said Ullrich
yelled at him to get out of the car, so he did. As Ullrich walked rapidly toward him, Holden raised his
hands to ward off the attack; Holden denied hitting Ullrich. Holden noticed that Ullrich held a knife in his
left hand. Ullrich then hit Holden in the face, breaking Holden's nose and knocking him down. When
Holden got up, Ullrich knocked him down again. Ullrich ignored his passenger's plea that he leave Holden
alone. As Holden tried to go back to his car, Ullrich followed him and hit him in the face at least twice
more.

 Immediately after Holden's testimony, the court instructed the jurors to consider the
evidence only if they found beyond a reasonable doubt that Ullrich committed the act. The court instructed
them to consider the evidence only to the extent it rebutted the self-defense and first-aggressor defenses. 
The court finally instructed that they could not consider the evidence as proof of Ullrich's character with
which he acted in conformity in killing Kiesling.

 Ullrich introduced rebuttal evidence. His dental records showed he split a tooth around
the time of the incident. He recounted a similar sequence of events, but painted Holden as the aggressor. 
Holden was following too closely, so Ullrich pulled over to let him pass. Instead of passing, Holden
stopped, got out of the car, and told Ullrich to get out. Holden enraged him by hitting him. Ullrich admits
then hitting Holden several times.

 Ullrich contends the Holden incident was too remote for testimony about it to be admissible
at the guilt-innocence phase of the trial. He argues that there must be some time limitation on character
evidence similar to the ten-year limit for using convictions to impeach a witness under Texas Rule of
Evidence 609(b). We decline to impose a time limit the rulemakers have not chosen to impose. The age
of the incident may affect the relevance of or the weight accorded the incident, but age does not mandate
exclusion. We hold the trial court did not abuse its discretion in admitting this evidence with the special
instructions limiting the purpose for which the jury could consider it.

 Ullrich also argues that the testimony about the Holden incident was made irrelevant by the
following distinctions from the Kiesling killing: (1) Ullrich did not know Holden, but knew Kiesling; (2) the
State presented the 1985 incident as prompted by "road rage," but presented the 1996 killing as intentional;
and (3) Ullrich only hit Holden, but stabbed Kiesling. We conclude that none of these distinctions makes
the incident irrelevant. Though the differences might diminish the incident's relevance to some aspects of
the offense, they do not alter its relevance in rebutting first-aggressor and self-defense. That Ullrich would
attack a stranger on the street tends to cast doubt on Ullrich's testimony that he merely defended himself
against Kiesling, a person with whom he had an ongoing conflict, or that Kiesling was the first aggressor. 
Ullrich pulled his knife both times, but simply overpowered Holden without resort to stabbing. The different
results of the attacks do not destroy the relevance of the earlier incident. The court did not abuse its
discretion by refusing to exclude Holden's testimony as irrelevant.

 Ullrich also contends Holden's testimony was unduly prejudicial. Because evidence of
other confrontations had already shown Ullrich to be aggressive, Holden's evidence was not unduly
prejudicial. Because Holden's testimony showed Ullrich capable of quick, irrational anger escalating
quickly to violence, its probative value was not substantially outweighed by its risk of causing undue
prejudice. Rather than hurting Ullrich's case, the evidence of previous violence provoked by anger
bolstered his unsuccessful claim of sudden passion. The court did not abuse its discretion by refusing to
exclude Holden's testimony as unduly prejudicial.

 We conclude that the trial court did not err reversibly by allowing Holden's testimony. We
overrule point eight.


Ineffectiveness of counsel

 By point of error seven, Ullrich claims that his counsel was ineffective for failing to object
to the admission of the investigator's stalking comment. We first examine whether counsel's performance
was deficient, then determine whether but for the deficiency the result would have been different. 
Hernandez v. State, 726 S.W.2d 53 (Tex. Crim. App. 1986). The record supports the concurrence of
Ullrich and the State that, apart from failing to keep out the "stalking" evidence, Ullrich's counsel performed
more than adequately.

 We conclude that the evidence otherwise establishing the stalking behavior overwhelms
any harm from counsel's failure to object to Benjamin's testimony. We have determined above that
Benjamin's testimony was properly admitted and, more critically, that its admission did not change the result
of the case. Testimony from four jurors and one alternate juror at the hearing on the motion for new trial
confirms our conclusion. Four of the five jurors remembered the "stalking" testimony; one recalled it only
vaguely. Each testified that she would have voted to convict without that testimony because of the other
evidence in the trial. One testified that it only confirmed what she thought based on other evidence. The
jurors variously assessed the following as the most compelling evidence of guilt: (1) that Ullrich waited for
Kiesling to drive by and followed him to the confrontation site; (2) that Ullrich did not retreat but stabbed
Kiesling; (3) that after the stabbing Ullrich chased Kiesling, whom he supposedly feared had a gun; and 4)
that Ullrich took his child to school after the stabbing. This evidence was independent of Rodriguez's
statement. Because the admission of the stalking remark was not error and did not harm Ullrich, we
conclude his attorney's performance was not ineffective. We overrule point of error seven.


Credit for pre-sentence "house arrest"

 By point of error nine, Ullrich complains that the trial court erred by denying him pre-sentence jail time credit for the time he spent under "house arrest" and electronic monitoring. The State
responds that the court gave Ullrich all credit due and that the statutes do not authorize credit for the pre-sentence days he was electronically monitored. The court allowed credit for the seventy-three days Ullrich
spent in jail between his January 22 arrest and April 2 release to electronic monitoring. Ullrich wants credit
for the period between April 2 and October 28, an additional 209 days. During the hearing on the motion
for new trial, the trial court apparently sided with Ullrich on this issue, but did not revise its judgment
awarding credit for only seventy-three days.

 The Code of Criminal Procedure does not directly address credit for pre-sentence house
arrest. The Code allows courts to award credit for "the time that the defendant has spent in jail in said
cause, other than confinement served as a condition of community supervision, from the time of his arrest
and confinement until his sentence by the trial court." Tex. Code Crim. Proc. Ann. art. 42.03, § 2(a) (West
Supp. 1998). State law also allows a 


 court in a county served by a community supervision and corrections department that has
an electronic monitoring program approved by the community justice assistance division
of the Texas Department of Criminal Justice [to] require a defendant to serve all or part
of a sentence of confinement in county jail by submitting to electronic monitoring rather than
being confined in the county jail.



Tex. Code Crim. Proc. Ann. art. 42.035(a) (West Supp. 1998). A judge may permit house arrest,
including electronic monitoring, at the time of sentencing or at any time during service of the sentence. 
Code art. 42.035(b). The statute provides that a "defendant who submits to electronic monitoring or
participates in the house arrest program under this section discharges a sentence of confinement without
deductions, good conduct time credits, or commutations." Code art. 42.035(d).

 Ullrich argues that we should read these provisions together to allow credit for the time he
submitted to electronic monitoring before sentencing. Ullrich cites no authority to support this proposition
and we find none.

 We find no error. Ullrich relies on the trial court's oral pronouncements agreeing with his
requested credit for time spent on house arrest. The written judgment controls over any oral
pronouncements at the hearing, however, and the trial court never amended its written judgment. Because
the Code does not require giving credit for pre-sentence time served on house arrest, the court's authority
to grant credit for such time is discretionary at most. We find no abuse of discretion in the court's failure
to award credit for that time. We overrule point nine.


Restitution

 The State confesses error with respect to the restitution order challenged in point of error
ten. The State admits that Texas Code of Criminal Procedure article 42.037 requires the trial court to hold
a hearing on restitution, admits that no hearing was held, and concedes that we should delete the restitution
order. We appreciate the State's candor and sustain point of error ten.


CONCLUSION


 We reform the judgment by deleting the restitution ordered. We affirm the judgment as
reformed.



 

 Bea Ann Smith, Justice

Before Justices Powers, Jones and B. A. Smith

Reformed and, as Reformed, Affirmed

Filed: July 2, 1998

Do Not Publish

1. Though the trial was held using the Texas Rules of Criminal Evidence, we refer to the consolidated
civil and criminal Texas Rules of Evidence unless there is a substantive difference.
2. At the guilt-innocence stage, the jury weighed the evidence against charges of murder, manslaughter,
and aggravated assault; sudden passion is now a factor only in mitigating punishment. Tex. Penal Code
Ann. § 19.02(d) (West 1994). Under the murder charge, the State had to prove that Ullrich intended to
cause Kiesling serious bodily injury and committed an act clearly dangerous to human life that caused
Kiesling's death. See Code § 19.02(b). Under the manslaughter charge, the State had to prove that
Ullrich recklessly killed Kiesling. See Code § 19.04(a). Ullrich was reckless if he was aware of but
consciously disregarded a substantial and unjustifiable risk that a result would occur; the risk had to be such
that its disregard constituted a gross deviation from the standard of care that an ordinary person would
exercise under the circumstances as Ullrich viewed them. Under the aggravated assault charge, the State
had to prove that Ullrich intentionally, knowingly, or recklessly caused Kiesling bodily injury by stabbing
him and either that the knife was a deadly weapon or that the injuries inflicted were serious bodily injuries. 
Code § 22.02(a). Self-defense is an affirmative defense that a defendant must prove by a preponderance
of the evidence. Saxton v. State, 804 S.W.2d 910, 912 n.5, 913 n.7 (Tex. Crim. App.1991); Code §
2.04(d) (West 1994).


 The court told the jury that Ullrich was justified in using force when and to the degree he reasonably
believed the force was immediately necessary to protect himself against the other person's use or attempted
use of unlawful force. See Code § 9.31. The court instructed the jury that he was justified in using deadly
force if he reasonably believed it necessary to protect himself against the other person's use or attempted
use of unlawful deadly force if a reasonable person in the defendant's situation would not have retreated. 
See Code § 9.32. The State was not required to produce evidence to refute a self-defense claim, but had
to prove its case beyond a reasonable doubt. Saxton v. State, 804 S.W.2d 910, 912 (Tex. Crim.
App.1991). The State had the burden of persuasion, not of production. Id. at 913. Self-defense was an
issue of fact to be determined by the jury and the jury was free to accept or reject the defensive evidence. 
McAllister v. State, 933 S.W.2d 763, 766 (Tex. App.--Houston [14th Dist.] 1996, pet. ref'd). A jury
verdict of guilty is an implicit finding rejecting the defendant's self-defense theory. Id.


e written judgment controls over any oral
pronouncements at the hearing, however, and the trial court never amended its written judgment. Because
the Code does not require giving credit for pre-sentence time served on house arrest, the court's authority
to grant credit for such time is discretionary at most. We find no abuse of discretion in the court's failure
to award credit for that time. We overrule point nine.


Restitution

 The State confesses error with respect to the restitution order challenged in point of error
ten. The State admits that Texas Code of Criminal Procedure article 42.037 requires the trial court to hold
a hearing on restitution, admits that no hearing was held, and concedes that we should delete the restitution
order. We appreciate the State's candor and sustain point of error ten.


CONCLUSION


 We reform the judgment by deleting the restitution ordered. We affirm the judgment as
reformed.