**James Roy KNOX**

v.

**Gary L. JOHNSON, Director, Texas Department of Criminal Justice, Institutional Division.**

No. Civ.A. G–99–84.

United States District Court, S.D. Texas, Galveston Division.

Aug. 23, 1999.

John Gary Hart, Hart & Norris, Austin, TX, for James Roy Knox, petitioner.

Gena Bunn, Office of Attorney General, Austin, TX, Christina Thompson, Office of Atty. General, Austin, TX, for Gary L. Johnson, Director, Texas Department of

Criminal Justice, Institutional Division, respondent.

## ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND GRANTING SUMMARY JUDGMENT

KENT, District Judge.

Now before the Court is James Roy Knox's Amended Petition for Writ of Habeas Corpus (the "Petition"), filed February 8, 1999, and Respondent's Motion for Summary Judgment, filed June 30, 1999. For the reasons set forth below, the Amended Petition is **DENIED,** and Respondent's Motion for Summary Judgment is **GRANTED.**

## I.  PROCEDURAL BACKGROUND OF THE CASE

Knox was first convicted on December 5, 1985, of murder in the course of a robbery, a capital offense under Section 19–03(a)(2) of the Texas Penal Code. The Texas Court of Criminal Appeals affirmed the conviction. *Knox v. State,* 744 S.W.2d 53 (Tex. Cr.App.1987), *cert. denied,* 486 U.S. 1061, 108 S.Ct. 2834, 100 L.Ed.2d 934 (1988). Knox's state habeas petition was denied.

Knox next filed a federal habeas petition which was denied by this Court. On March 28, 1991, the Fifth Circuit reversed this Court's ruling and remanded the case "with directions to grant the writ of habeas corpus, unless the State of Texas conducts a new penalty phase determination within a reasonable time." [1] *Knox v. Collins,* 928

F.2d 657, 662 (5th Cir.1991). The mandate for this ruling issued on April 19, 1991.

On November 8, 1991, Knox filed a motion with this Court asking it to enforce the Fifth Circuit mandate and urging that the district court grant his habeas relief because the state court had not yet retried him. The State responded that the Fifth Circuit mandate impliedly left the responsibility to the district court to set "a reasonable time" in which a retrial should begin because the mandate was directed to the federal district court only. The State conceded that it had made a decision to retry Knox in May 1991, but did not proceed due to its interpretation of the federal mandate. Therefore, the State argued, because Knox did not move to enforce the mandate earlier, Knox had created the delay himself.

At the February 22, 1992, hearing on Knox's motion, this Court agreed with Knox that the Fifth Circuit mandate did not require an additional order from the Court setting a time limit for a new trial to begin. However, this Court also ruled that the ten-month time period between the issuance of the mandate and the hearing on Knox's motion did not violate Knox's Sixth Amendment right to a speedy trial. On February 26, 1992, this Court issued an order denying Knox's motion to grant habeas relief and requiring the State to begin retrial within ninety days. *Knox v. Collins,* N. G–88–382 (S.D.Tex. Feb. 26, 1992).[2]

Knox was convicted a second time on June 22, 1994, and assessed the death penalty pursuant to the jury's answers to the

---

1.  The law applicable to the instant case did not permit the conducting of a new "penalty determination" alone.

2.  Knox immediately moved to stay the order which was granted by this Court. *Knox v. Collins,* No. G–88–382 (S.D.Tex. March 26, 1992). Knox then appealed the ruling to the Fifth Circuit. On appeal, the Fifth Circuit affirmed. *Knox v. Collins,* 999 F.2d 824 (5th Cir.1993). The court specifically held that its previous mandate was self-executing, but that "a reasonable time" was not limited to ninety days. *Id.* at 825–26. Further, the court held

that Knox had "not established an unreasonable delay in the constitutional sense and the district court had not abused its discretion." *Id.* at 826. Certiorari was denied on January 10, 1994. *Knox v. Collins,* 510 U.S. 1061, 114 S.Ct. 732, 126 L.Ed.2d 696 (1994). The stay was lifted by agreed motion on March 8, 1994, giving the State until June 7, 1994 to begin retrial. The instant trial began on May 31, 1994. Knox does not complain about the delay of the trial until 1994 that he created by his choice to appeal the February 26th order.

special issues. The Court of Criminal Appeals affirmed the conviction in a published opinion on November 20, 1996. *Knox v. State,* 934 S.W.2d 678 (Tex.Crim.App. 1996). On June 30, 1997, Knox filed an application for writ of habeas corpus in the trial court. The trial court conducted an evidentiary hearing on March 24, 1998. On May 28, 1998, the state habeas court filed its findings of fact and conclusions of law recommending the denial of state habeas relief. The Court of Criminal Appeals denied state habeas relief on October 14, 1998, adopting the state habeas court's findings of fact and conclusions of law. Knox filed the instant petition on February 8, 1999.

## II. FACTUAL BACKGROUND OF THE CASE [3]

### Eye–Witness Testimony

At approximately 5:30 p.m. on November 10, 1982, the victim, a pharmacist, and his assistant, Ronald Dale Dyda, were getting ready to close Joe's Pharmacy Center for the day when a man appeared at the counter. Dyda described the man as being about six feet tall, white, unshaven, and with a thin build. The man pointed a small, dark semi-automatic pistol at them and demanded money and drugs. He told them to "get down on the floor." Dyda complied, but the victim did not. The victim told the man that they did not have drugs there and that the man would not get away with it. The perpetrator was not swayed.

The robber gave Dyda some medical tape and told him to tie the victim's hands. However, the victim kept pulling his hands apart so Dyda could not bind them. The man began to get angry. At this point the phone rang and the victim answered it. Dyda testified that the man again asked for the money, but the victim prevented him from giving it to the man.

Joanne Seelbach was on the other end of the phone line. She testified that the victim answered the phone as usual,[4] but then she heard him repeat, "He don't know where the dope's at" three times. After she heard the victim say to take the money, she heard another male voice say, "I want the God damn dope." The victim again repeated, "He don't know where the dope's at." Seelbach then testified that she heard the unidentified male voice say, "You son-of-a-bitch I am going to kill you." She then heard a shot and the male voice state, "Now you will give me the dope you son-of-a-bitch." She then hung up the phone to call the police.

Meanwhile, after the victim had answered the phone, the robber told Dyda once again to tie the victim's hands. The victim again successfully resisted. The robber got angrier, told them to get behind the counter, and threatened to kill them both. When Dyda turned to go behind the counter, he heard a gun shot. He turned and saw that the victim had fallen behind the dispensing counter into a blue curtain. Dyda testified that the victim never acted aggressively or resisted the man physically.

The robber then pointed the gun at Dyda and demanded the money and "class A" drugs.[5] In response, Dyda gave the robber four small brown bottles of Demorol and the money from the cash register. The robber then asked if there were more drugs. Dyda replied that there were and when he retrieved some to put on the counter, the robber had already fled. The victim died shortly thereafter of a gunshot

---

3. These facts are taken from the summary of facts set forth by the Court of Criminal Appeals. *Knox v. State,* 934 S.W.2d 678, 683–86 (Tex.Crim.App.1996).

4. Seelbach was a long-time customer of the pharmacy and was familiar with the victim's voice.

5. Dyda testified that "class A" narcotics are controlled substances that have the highest potential for abuse such as Demorol, Dilaudid, and morphine.

wound to the midchest that perforated his heart and severed his spine. The bullet came from either a .38–caliber or 9mm gun.

Also at approximately 5:30 p.m. that day, Kathleen Austin, Gene Austin, and Robert Clarac were sitting and talking at the catering shop next door to Joe's Pharmacy Center when they heard a loud bang. All three went outside because they thought the noise came from someone hitting a car in the back parking lot.

Kathleen Austin and Robert Clarac went out the front door and down the alley between the pharmacy and the catering shop towards the back parking lot. Kathleen noticed that a car was in the lot with its motor running. The car was old, dark brown, and had a light colored top. Having seen no damage to her vehicle, she started back to the front of the building when a man came running around the corner from the direction of Joe's Pharmacy Center. She described the man as about six feet tall with a thin build, unshaven and scraggly-looking with medium brown hair. After almost running into Kathleen, the man said "Have a nice day" and then walked on. Kathleen further testified that the man had his left hand up under his shirt and about three brown bottles in his right hand. She thought it was unusual that the pharmacist had let someone take their prescriptions without putting them in a bag. Consequently, she went to check on the pharmacist and found that he had been shot. Clarac testified that he observed the same events.

Gene Austin, who had gone out the back door of the catering shop, also described the man and the car in the same manner as Kathleen and Clarac. Gene further testified that there was a driver waiting behind the wheel of the car and further saw the unshaven man get into the passenger seat of the car. The car then drove off in a westerly direction. After learning that the victim had been shot, Gene at-tempted to follow the brown car but it was too late.[6]

*Accomplice Testimony*

George Holland, the confessed driver of the dark brown car, testified that in October of 1982 [Knox] discussed with him, Gary Morgan, and Robert Clark the possibility of robbing the employees of a certain drug store in Galveston, Texas. The four were in Alabama at the time. He testified that [Knox] said the robbery would be a "piece of cake" because there were no cameras in the store. [Knox] had formerly resided in Galveston in 1981. [Knox] further stated that the purpose of the robbery would be to obtain drugs and money. Holland also testified that he had seen [Knox] with a small, dark gray semi-automatic .38–caliber pistol.

Not long after this discussion, Gary Morgan went to Houston with Ed Duke to work installing carpet in a department store. A few days later, in November of 1982, [Knox] and Holland followed. Holland testified that they were driving his brother-in-law's 1972 dark brown Chevrolet with a cream colored top. Upon arriving in Houston, they went to stay at Ed Duke's where Morgan was also staying.

After meeting up with Morgan and his girlfriend, Sandra, [Knox], Holland, Morgan, and Sandra drove to Galveston. On the way, Holland testified that [Knox] again discussed robbing the drug store. When they arrived in Galveston, the group drove to Joe's Pharmacy. Gary and Sandra went inside to see if any cameras had been installed since [Knox] had last been there. They had not. Meanwhile, [Knox] and Holland waited in the car. After learning about the lack of security, the foursome went to drink beer and [Knox] discussed his plan: he would rob the store employees and Holland would drive the car. Sandra testified that she went to walk along the beach while the men had this discussion. The foursome then re-

---

**6.** [Knox] and his accomplices, *see infra*, were not apprehended until two years later. None of the eye-witnesses were able at that time to positively identify the perpetrators.

turned to Houston. The next day, [Knox] and Holland again went to Galveston. They sat around drinking beer until the sun began to go down. The two then went to the pharmacy. Holland waited out in the back parking lot of the store and [Knox] went inside. Holland testified that [Knox] took longer than he expected and when he returned, he directed Holland to leave a certain way. As they were leaving, Holland stated he saw people coming around the side of the building. [Knox] then got on the floorboard of the car and directed Holland on how to get out of Galveston. Holland noticed [Knox] had possession of about three brown pill bottles.

As they were leaving Galveston, Holland testified that [Knox] said, "The man got ignorant with me. I had to shoot him." When Holland asked him "how bad," [Knox] replied, "I killed the motherfucker." Holland then informed [Knox] that [Knox] had to get out of his car and "find some other way around." Holland testified that [Knox] had assured him that no one would get hurt during the robbery. He dropped [Knox] off on the mainland and called Gary Morgan to pick up [Knox] and take him to a bus station. Holland then left for Alabama.

Gary Morgan also testified that [Knox] had previously discussed a robbery at a drug store and that he, Sandra, Holland, and [Knox] had driven down to Galveston to confirm the store's lack of security the day prior to the robbery. He further testified that the day of the robbery, Holland phoned him and asked him to meet him at a bar. When Morgan arrived, Holland told him that he and [Knox] had committed the robbery and that Holland wanted him to pick up the [Knox] because he had left him down the road. Morgan agreed.

Morgan drove to where Holland stated that he had left [Knox]. Morgan pulled over and pretended to have car trouble. He opened the hood of his car and had taken "the breather off the car" when [Knox] ran up. [Knox] had some small brown pill bottles with him, so Morgan told him to put them into the breather. The two then drove to a service station where [Knox] proceeded to shave off his beard leaving only a mustache. Morgan testified that prior to this [Knox] had a shaggy-looking beard and was not well-groomed.

Morgan testified that [Knox] told him that he had used his gun while committing the robbery. [Knox] stated that he had attempted to tape the man up, but that the man had broken the tape each time. [Knox] then told him that when the man reached for his back pocket, [Knox] shot him and the man fell back into some curtains. [Knox] also stated that he got the bottles of drugs from the boy that was left at the counter and that the boy was too scared to know what to do. Morgan drove [Knox] to the bus station. Once there, [Knox] took the bottles from the breather of the car and gave two to Morgan along with some money. Morgan testified that he told [Knox] that he did not want it, but [Knox] gave it to him anyway. Morgan left [Knox] at the station and when he got home he hid the bottles in his car and later took them back to Alabama as [Knox] requested.

### Other Evidence

Walter Robert Clark, a friend of [Knox]'s in Alabama, testified that [Knox] had talked to him about robbing the employees of a drug store in Galveston. [Knox] told him that he wanted money and "class A" drugs and that the robbery would be easy. Clark testified that he told [Knox] that the robbery was a bad idea because a drug store would not have a large stock of "class A" drugs. [Knox] and Holland left for Galveston anyway. Clark stayed in Alabama.

About a week later, [Knox] returned to Alabama. [Knox] told Clark that he had robbed a pharmacist in Galveston for some Demorol and had to shoot a man. The Demorol was in little brown bottles. Clark testified that he knew [Knox] owned a

small, dark .38–caliber automatic pistol; however, [Knox] told him that he buried the gun. [Knox] also told Clark that Holland drove the car during the robbery, but Holland had put him out of the car and Morgan had to come pick him up. Clark further stated that when Morgan arrived back in Alabama, he brought over more Demorol which had been hidden in his car.

[Knox]'s cellmate after his arrest in November of 1984, Carroll Bernard Smith, also testified at trial. Smith stated that [Knox] told him about committing the robbery in Galveston. [Knox] related that he had tied-up the person's hands, but when the man reached for the front of his pants, [Knox] shot him. [Knox] stated that he had obtained "class A" narcotics and that he had someone waiting outside in a car. [Knox] further told Smith that he and the waiting driver drove to some half-way point where he buried the gun and from there a second party took him back to south Houston where he stated he "did another job."

Finally, Kathy Pressletz, [Knox]'s former roommate, testified. Pressletz stated that she and [Knox] were roommates in Galveston during the summer of 1981. [Knox] was familiar with Joe's Pharmacy Center and had told her that it would "be easy to knock off." Pressletz interpreted this to mean "rob."

## III. STANDARD OF REVIEW

When ruling on a motion for summary judgment, the evidence is viewed through "the prism of the substantive evidentiary burden." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). In this case, because Knox's Petition is governed by the Antiter-

rorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254 (West 1994 & Supp.1998),[7] that prism differs depending upon whether the issue is one of law, fact, or both. *See Drinkard v. Johnson*, 97 F.3d 751, 767–68 (5th Cir.1996), *cert. denied*, 520 U.S. 1107, 117 S.Ct. 1114, 137 L.Ed.2d 315 (1997).

For questions of fact, habeas relief may be granted only if the Court finds that the state court made a determination of fact that was unreasonable in light of the evidence presented to it. *See* 28 U.S.C. § 2254(d)(2); *Drinkard*, 97 F.3d at 767–68. When reviewing such factual determinations, the Court must presume correct the factual findings of the State court, unless the Petitioner "rebut[s] the presumption of correctness by clear and convincing evidence." See 28 U.S.C. § 2254(e)(1); *Jackson v. Anderson*, 112 F.3d 823, 824–25 (5th Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 1059, 140 L.Ed.2d 120 (1998). When considering questions of law, on the other hand, this Court may grant habeas relief only if the state court's determination of law is contrary to "clearly established" Supreme Court precedent. *See* 28 U.S.C. § 2254(d)(1); *Drinkard*, 97 F.3d at 768. Habeas relief generally may not be premised on rules of constitutional law that have yet to be announced or that were announced after the challenged conviction became final. *See Teague v. Lane*, 489 U.S. 288, 305–08, 109 S.Ct. 1060, 1073–74, 103 L.Ed.2d 334 (1989). Finally, for mixed questions—that is, those containing issues of law and facts[8]—relief is granted only if the state court decision rests on an "unreasonable application of ... clearly established Federal law, as determined by the Supreme Court," 28 U.S.C. § 2254(d)(1),

---

**7.** The Fifth Circuit has determined that the AEDPA applies to cases where a petition for habeas corpus is filed on or after April 24, 1996. *See Williams v. Cain,* 125 F.3d 269, 274 (5th Cir.1997).

**8.** A mixed question of law and fact has been defined as a question "in which the historical facts are admitted or established, the rule of

law is undisputed, and the issue is whether the facts satisfy the statutory standard, or to put it another way, whether the rule of law as applied to the established facts is or is not violated." *Pullman–Standard v. Swint,* 456 U.S. 273, 289 n. 19, 102 S.Ct. 1781, 1791 n. 19, 72 L.Ed.2d 66 (1982).

i.e., when the state decision "is so clearly incorrect that it would not be debatable among reasonable jurists." *Drinkard,* 97 F.3d at 768, 769; *see Carter v. Johnson,* 110 F.3d 1098, 1106–08 (5th Cir.) (with a mixed question of law and fact, the facts are presumed correct and then the law is reviewed for reasonableness, not de novo), *vacated on other grounds,* — U.S. —, 118 S.Ct. 409, 139 L.Ed.2d 313 (1997).

## IV.  PETITIONER'S ASSERTED GROUNDS FOR RELIEF

A.   Ground One:

Petitioner's conviction for capital murder and his death sentence violate the Sixth Amendment because Petitioner was denied a speedy trial.

In his first point of error, Knox argues that the trial court denied him his Sixth Amendment right to a speedy trial when it waited eleven months between the Fifth Circuit's order of remand for a new trial on March 28, 1991, and this Court's order of February 26, 1992, requiring the trial court to commence trial within ninety days.  The basis for alleged prejudice resulting from the delay is that an alibi witness, Marion Wilson, was available prior to the trial date but was not available on the trial date.

▇▇▇  In *Barker v. Wingo,* the Supreme Court established a four-part balancing test to determine whether a defendant received a speedy trial within the meaning of the Constitution, including (1) the length of the delay; (2) the defendant's assertion of this right; (3) the reason for the delay; and (4) the prejudice to the defendant. "The length of the delay is to some extent a triggering mechanism. Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance." *Barker v. Wingo,* 407 U.S. 514, 530, 92 S.Ct. 2182, 2191–92, 33 L.Ed.2d 101 (1972).  The actual length of delay necessary to warrant an application of the other factors in the balancing

test is not defined by the Constitution, but must be considered in light of the circumstances of the particular case. *Id.* at 530–31, 92 S.Ct. at 2191–92.  "A delay of less than one year will rarely qualify as 'presumptively prejudicial' for purposes of triggering the *Barker* inquiry." *Cowart v. Hargett,* 16 F.3d 642, 646 (5th Cir.), *cert. denied,* 513 U.S. 886, 115 S.Ct. 227, 130 L.Ed.2d 153 (1994); citing *Doggett v. United States,* 505 U.S. 647, n. 1, 112 S.Ct. 2686, 2691 n. 1, 120 L.Ed.2d 520 (1992). Further, a delay of ten and one-half months is not presumptively prejudicial. *Id.* at 647, 112 S.Ct. 2686.  In fact, absent extreme prejudice or a showing of willfulness by the prosecution to delay the trial in order to hamper the defense, a delay of less than one year will not trigger an examination of *Barker* factors. *Id.; see also Barker,* 407 U.S. at 531, 92 S.Ct. at 2192.

▇▇▇  The state courts on both direct and state habeas corpus review foreclosed this claim, holding that Knox was not deprived of his right to a speedy trial.  In explaining its reason for the delay, the State asserted that it was waiting for the district court to execute an order to commence trial pursuant to the Fifth Circuit's remand before setting the trial date.  *See Knox v. State,* 934 S.W.2d at 681.  Although the Fifth Circuit ultimately held its order remanding the cause to the trial court to be self-executing, the State's reason for delaying the trial eleven months did not fall under the rubric of "extreme prejudice or a showing of willfulness by the prosecution to delay the trial in order to hamper the defense."  "Where the state advances valid reasons for the delay ... this factor is weighed in favor of the state." *Barker v. Wingo,* 407 U.S. at 531, 92 S.Ct. at 2192.  Ultimately, the Court of Criminal Appeals was unwilling to attribute bad faith (willfulness) to the State, and this conclusion was neither an unreasonable application of the law or the facts. Knox has therefore failed to show that the

State intentionally delayed trial in order to hamper the defense.

Moreover, Knox fails to show prejudice resulting from the delay. Although Knox alleges that the delay of trial prohibited Marion Wilson from testifying to an alibi defense at the second trial, Wilson proffered conflicting affidavits as to the alibi defense. In the affidavits he signed for state habeas counsel to attach to Knox's state habeas petition, Wilson attest that "[i]n November of 1982, at the time of the crime James Roy Knox was employed by me. He was working in Richmond, Virginia at a Motel 6 job site." In the affidavit he provided to the State prior to the state habeas evidentiary hearing, Wilson merely attested that: "As best that I can recall (all my work records have been destroyed) I had been contracted to do sheetrock work at a new Motel 6 that was being constructed in Richmond, Virginia. The job lasted about four months. I don't recall when the job started." He failed to mention any dates, thereby frustrating the defense's alibi theory. Finally, the State presented an affidavit from the vice-president of Motel 6, Roger J. Reith, attesting that no Motel 6 existed in Richmond, Virginia in November of 1982. Furthermore, at the first trial, Wilson did not testify to an alibi defense. He testified that Knox worked for him outside of Texas during 1984 and possibly 1983. The trial court found that "the affidavit of Marion Wilson wherein he claims to be an alibi witness for [Knox] to be without merit and untrue." Based on these facts, the findings of the state court as to Petitioner's failure to show prejudice resulting from the trial's delay, adopted by the Court of Criminal Appeals, were reasonable. Knox has therefore failed to show "extreme prejudice."

Accordingly, Petitioner's Ground One is **DENIED.**

B. Grounds Two and Three:

Petitioner's conviction for capital murder and his sentence of death violate the due process clause of the Fourteenth Amendment because the State knowingly used false testimony from Kathy Pressletz at both the guilt and punishment phases of his trial.

Petitioner's conviction for capital murder and his sentence of death violate the Eighth Amendment because the State used the inherently unreliable testimony of Kathy Pressletz at both the guilt and punishment phases of trial.

■■■ The Due Process Clause of the Fourteenth Amendment forbids the knowing use by the State of perjured testimony. *Giglio v. U.S.*, 405 U.S. 150, 153, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972). To obtain relief on his claim that the State introduced "false evidence," Knox bears the burden of demonstrating: (1) that Pressletz testified falsely, (2) that the false testimony was material, and (3) that the prosecution offered the testimony knowing it to be false. *Giglio*, 405 U.S. at 153–54, 92 S.Ct. at 766.

Kathy Pressletz was a witness for the State at both of Petitioner's trials, and provided corroboration for George Holland and Gary Morgan, two accomplice witnesses. When the State called Pressletz during the second trial, she testified that she lived with Knox "[a]round the middle part of the summer of '81," that she and Knox would drive by Joe's pharmacy and Knox would say "it was easy to knock off," that Knox told her he owned guns, that Knox smoked marijuana and used amphetamines every day, that they lived in an apartment as roommates on the corner of 39th and Avenue S above Snuffy's Bar, that James Louis Russell, her father, owned the building "at one time" in the past. During the punishment phase of the second trial, Pressletz testified that Knox talked about robbing drugstores daily, that "he mentioned to [Pressletz] about lynching a man in Vidor," that Knox threatened to kill her after she testified against him in a prior hearing, that Pressletz harbors "no doubt in [her] mind that if [Knox] ever got out he would kill [her]."

Mark A. Robertson and Patrick Bishop, then members of the law firm of Fulbright & Jaworski in Houston, represented Petitioner in his first state post-conviction application for writ of habeas corpus. Robertson obtained the name and telephone number of Georgia Hughes from the medical records of Katherine Hughes Presslitz. Georgia Hughes identified herself as Katherine Hughes Presslitz's mother. She told Robertson that "she had never heard of a man named James Russell, that she had never been married to James Russell, and that James Russell is not Katherine Hughes' father." Robertson also attested that he reviewed the Galveston County deed records to determine the ownership of the building at 39th and Avenue S, but found no record that James Russell ever owned the property. Patrick Bishop attested, based upon his review of medical records, that Katherine Hughes Presslitz never received treatment for any cuts or stab wounds at the University of Texas Branch Medical Hospital in Galveston, Texas between August 1978 and January 1983. Respondent points out that none of this information is conclusive as to the lack of veracity of Pressletz's statements. Kathy Pressletz identified herself as "Kathy Adel Pressletz" in the second trial record, a variation in the first name, middle name, and spelling of the last name from the person whose mother Robertson contacted and whose records Bishop examined.

During the second state habeas proceedings, prosecutor Wayne Mallia submitted an affidavit, attesting to his reasons for presenting the testimony of Kathy Pressletz during the second trial:

> I made the decision to introduce evidence through the testimony of Kathy Pressletz that James Roy Knox had made the statement that he lynched a man in Vidor, Texas. The purpose of introducing this statement was not to prove that Knox actually did lynch a man in Vidor, Texas but to show his character; to show that he was the type of person that would make such a statement.
>
> I was also the prosecutor who sponsored and questioned Kathy Pressletz as a witness. There was no known perjured testimony by Kathy Pressletz to the best of my knowledge nor did I acquiesce to any known perjured testimony in the trial of this case. Kathy Pressletz's testimony that she was told by the defendant that he lynched a man in Vidor was not shown to be perjured testimony by the alleged lack of public records that any lynching occurred in Vidor, Texas during that time period. Again, her testimony merely established that this is what the defendant told her not that the act in fact occurred. Kathy Pressletz was not just questioned about matters that only she could refute on direct examination. She was questioned about at least four other material matters that were corroborated by other witnesses. To the best of my knowledge Kathy Pressletz did not know these corroborating witnesses nor did she talk to them about her testimony. Kathy Pressletz was not prosecuted for alleged perjured testimony in the first trial regarding her being cut by the defendant because there is no proof that this was perjured testimony. There are many explanations for the lack of medical records regarding Kathy Pressletz being cut. As a matter of fact, the defendant added credence to the veracity of her testimony regarding the lynching and being cut by the defendant by threatening to kill her at the end of her testimony in the first trial. It is well accepted law that this shows a consciousness of guilt. There was no decision on the part of my office not to prosecute Kathy Pressletz for perjury in order to insulate her from being impeached at the defendant's trial. I presented Kathy Pressletz's testimony in *complete good faith.*

The state habeas court found, and the Court of Criminal Appeals adopted the

finding, that the "affidavit of Wayne J. Mallia, chief prosecutor in [Knox's] second trial, shows Pressletz testified truthfully at trial as to those matters testified to by her, and that the State had no basis to believe otherwise." On these facts, both courts were reasonable in finding that the State had not offered false or perjured testimony during the trial and that Knox was not denied due process guaranteed by the Fourteenth Amendment.

Further, defense counsel had the opportunity to impeach Pressletz during her trial. The defense impeached Pressletz on cross-examination during the guilt-innocence phase by asking her, "Would it surprise you to know that a Louis Russell has never owned property in Galveston County?" and "Would it surprise you to know that there is no recorded name for Snuffy's Bar in Galveston County?" On cross-examination in the punishment phase, defense counsel also established that Knox and Pressletz were drinking and doing drugs when Knox made the statement about lynching a man in Vidor. In light of all the facts, then, the state habeas court's finding, adopted the Court of Criminal Appeals, that "no testimony was presented from Kathy Pressletz under circumstances that effectively prevented [Knox's] trial attorney from exposing the likelihood that it was false" was also reasonable. Moreover, Petitioner himself had the opportunity to refute Pressletz's testimony, yet he and his Counsel apparently made the tactical decision to instead exercise Petitioner's constitutional privilege against self-incrimination.

In *Johnson v. Mississippi*, 486 U.S. 578, 108 S.Ct. 1981, 100 L.Ed.2d 575 (1988), the Supreme Court mandated that the decision by governmental authority to impose death "cannot be predicated on mere 'caprice' or on 'factors that are constitutionally impermissible or totally irrelevant to the sentencing process.'" In *Johnson*, the Supreme Court vacated a death sentence because the jury considered false evidence, specifically "the sole piece of documentary evidence of any relevance to [the State's] sentencing decision." *Id.* at 585, 108 S.Ct. at 1986. The record demonstrates that Pressletz's testimony was neither false, nor was it the sole piece of documentary evidence relevant to the sentencing decision.

Accordingly, Petitioner's Grounds Two and Three are **DENIED.**

**C. Grounds Four and Five:**

Petitioner's Death Sentence violates the Sixth and Fourteenth Amendments because the trial court granted a State's challenge for cause predicated upon a bias against the death penalty when the State failed to satisfy its burden to show the prospective juror Regina George would be substantially impaired in her ability honestly to answer the statutory special issues.

Petitioner's Death Sentence violates the Sixth and Fourteenth Amendments because the trial court granted a State's challenge for cause predicated upon a bias against the death penalty when the State failed to satisfy its burden to show the prospective juror Albert Medina would be substantially impaired in his ability honestly to answer the statutory special issues.

In his fourth and fifth claims, Knox alleges that the trial court improperly granted the State's challenges for cause against jurors Regina George and Albert Medina and improperly allowed the State to rescind its challenge for cause against George and substitute a retroactive peremptory challenge.

In *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), the Supreme Court held that the State infringes upon a capital defendant's Sixth and Fourteenth Amendment rights when it excuses for cause all those members of the venire who express conscientious objections to capital punishment. However, a prospective juror may be excused for cause if her views regarding

capital punishment "would prevent or substantially impair the performance of [her] duties as a juror in accordance with [her] instructions and [her] oath." *Adams v. Texas*, 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980); *accord Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985). The determination as to whether or not a juror should be stricken for cause is a question of fact. *See Patton v. Yount*, 467 U.S. 1025, 1036, 104 S.Ct. 2885, 2891, 81 L.Ed.2d 847 (1984) (rejecting the circuit court's determination that it is a mixed question of law and fact). "[S]uch a finding is based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province," *Wainwright*, 469 U.S. at 428, 105 S.Ct. at 854, and therefore courts reviewing such findings on habeas review must accord them a presumption of correctness. *See id.; Patton*, 467 U.S. at 1037 n. 12, 1038, 104 S.Ct. at 2891 n. 12, 2892. Therefore, this Court must presume correct the trial court's decision to exclude George and Medina, based on that court's own observations of their demeanors and credibility, unless Petitioner rebuts that decision with clear and convincing evidence.

The record reveals that several of the views expressed by George justified the trial court to exclude her for cause. A series of exchanges demonstrated George's inability to answer the special issues in a manner that would invoke the death penalty:

Q: [Prosecutor]: Okay. Can you see any circumstances where you yourself could vote for the death penalty to be assessed against someone?

A: [George]: No.

Q: Okay.

A: No.

. . .

Q: ... You might find yourself in this situation. You found the Defendant guilty of capital murder sitting on the jury.

A: Okay.

Q: Would you vote for the death penalty or life? Which way would you go?

A: Life.

Q: Doesn't matter what the circumstances were, you would vote for life because that's what your conscience tells you?

A: Life.

. . .

Q: What I am asking you is because of what your conscience is telling you will you answer the question so the Defendant receives life and not death?

A: I would answer them to give life.

A: No matter what the evidence showed?

A: Right.

. . .

Q. Doesn't matter what evidence we put on, the State, you will not vote for death no matter what?

A: Right.

Q: No matter what the circumstances are you are not going to vote for death?

A: Right.

Q: Again, going over at this point the only thing you have taken an oath to do is tell the truth and I appreciate you doing that. But if you take an oath over there then you are required to follow the instructions of the Judge. Are you telling us now that you would not be able to follow the instruction of the Judge if that requires you to assess the death penalty?

A: Right.

George then waffled on her position several times after these exchanges.

The Court finds that the evidence supports the trial court's decision that George's exclusion for cause was proper,

and did not violate Knox's constitutional rights. The record indicates at the very least that George vacillated as to whether she could faithfully perform her legal duty as a juror. As stated in *Wainwright:*

> Despite this lack of clarity [regarding a prospective juror's bias] in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law ... [T]his is why deference must be paid the trial judge who sees and hears the juror.

*Wainwright,* 469 U.S. at 425–26, 105 S.Ct. at 852–52. Petitioner has presented no evidence to rebut this presumption of correctness.

■ Furthermore, the State exercised its right to withdraw its challenge for cause and instead struck George with a peremptory strike. Petitioner argues that allowing such a change of designation violates the tenets of *Grijalva v. State,* 614 S.W.2d 420 (Tex.Crim.App.1980), because additional venire persons were examined before the State withdrew its challenge for cause. The interpretation Petitioner urges is an overly narrow reading of the law. The concerns of the Court in *Grijalva* were two-fold: (1) to allow the State to exercise its peremptory challenges in a capital case *after conclusion of the voir dire examination* would give the State the benefit of making its judgments with a perspective of the entire panel, a perspective that is not given the Defendant; and (2) giving such a privilege to the State would allow the State to withhold its strikes until after the defendant had exercised his strikes, thereby transferring a benefit rightfully belonging to the defendant to the State. *Grijalva,* 614 S.W.2d at 424–25. As voir dire in this case had not concluded, and the State merely changed the designation of the strike as to George, neither of these concerns is implicated. To accept Petitioner's argument that *Grijalva* mandates that the State make a final decision as to the designation of either

challenge for cause or peremptory strike before another prospective juror is examined, is to hamstring the ability of the prosecution to make tactical decisions while the process of jury selection is evolving and ongoing. Until the process of jury selection is completed, no harm comes to the Defendant. Thus, George was properly stricken from the jury with a peremptory strike.

■ Unlike George, prospective juror Medina remained staunch in his inability to impose the death penalty. Petitioner challenges his exclusion, however, on the basis that the prosecutor did not explain to Medina the law and his duty under the law. *See Cuevas v. State,* 742 S.W.2d 331, 343, n. 12 (Tex.Cr.App.1987) ("Before a venireman is excused because of a bias or prejudice against the law, he should be told what the law is.") The following exchange demonstrates that the prosecutor did in fact indicate that Medina would have to weigh evidence before answering the special issues:

> Q: [Prosecutor]: You would answer the questions in a manner that would result in a life sentence versus a death sentence automatically?
>
> A: [Medina]: If I understand what I am reading.
>
> Q: Right. If the Judge told you what the answers would be to mean death, you would answer it in a way that would give a life sentence automatically?
>
> A: Yes, sir.

In addition, Medina testified that he would want the State to prove the defendant's guilt beyond all doubt before he found him guilty of capital murder, improperly elevating the standard from "reasonable doubt" to "beyond all doubt" despite the standard of proof relayed to him by the prosecution during group voir dire. The Court finds that the evidence supports the trial court's decision that Medina's exclusion for cause was proper, and did not violate Knox's constitutional rights.

Accordingly, Petitioner's Grounds Four and Five are DENIED.

### D. Ground Six

Petitioner was denied his Sixth Amendment right to the effective assistance of counsel at both the guilt/innocence and the punishment phases of his capital murder trial.

Petitioner asserts that defense counsel rendered ineffective assistance of counsel by allegedly: (1) failing to move for continuance and thereby alerting the trial court that the absence of Marion Wilson as an alibi witness at Knox's second trial was attributable to the State's eleven-month delay in commencing trial; (2) failing to move for continuance in order to secure Wilson's alibi testimony at a later date; (3) failing to object during voir dire or appropriately rehabilitate venire members excused for conscientious scruples against the death penalty; (4) failing to object to the testimony of Kathy Pressletz; (5) failing to impeach George Holland; (6) failing to object to the prosection's "illegal bolstering" of four witnesses; (7) failing to object to an extraneous offense; (8) and failing to present rebuttal evidence.

■ In order to demonstrate a deprivation of his Sixth Amendment right to the effective assistance of counsel, Petitioner must show both that counsel's representation fell below professional norms, and that there is a reasonable probability that, but for counsel's deficiency, the result of the trial would have been different. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The court may reject an ineffective assistance claim for want of either deficient performance or actual prejudice, eliminating the need to inquire further if Petitioner fails to carry his burden on either element. *Id.* at 697, 104 S.Ct. at 2069. Moreover, "[j]udicial scrutiny of counsel's performance must be highly deferential." *Id.* at 2065. The Court must indulge a strong presumption that strategic or tactical decisions made after an adequate investigation fall within the wide range of objectively reasonable professional assistance. *Id.* at 2065–66.

■ Petitioner's first two claims of ineffective assistance rest on his assertion of prejudice resulting from a failure to produce Marion Wilson as an alibi witness. As stated *supra*, however, the state court was reasonable in concluding that Wilson was not a valid alibi witness, thus Petitioner suffered no prejudice as a result of Wilson's failure to testify. Further, counsel's failure to call Wilson to testify or to move for continuance in order to do so was not ineffective assistance of counsel, but, as the trial court found, sound trial strategy given that Wilson was not a valid alibi witness.

■ Petitioner's next claim of ineffective assistance rests upon the alleged failure of defense counsel to make appropriate objections and properly rehabilitate prospective jurors during voir dire. As discussed *supra*, Petitioner fails to show deficient performance with regard to jurors George and Medina. Those jurors were properly struck and counsel is not required to object based upon frivolous arguments. Petitioner also complains that defense counsel "did a poor job of rehabilitating venire members," specifically prospective jurors Pena, Whitby, Bentsen, Bolding, Rodriguez, and Mackey. He alleges no facts as to what or how the omissions of those jurors prejudiced his case. Conclusory allegations in support of a claim of ineffective assistance of counsel are insufficient to raise a constitutional issue. *Green v. Johnson*, 160 F.3d 1029, 1042 (5th Cir.1998), *cert. denied*, —— U.S. ——, 119 S.Ct. 1107, 143 L.Ed.2d 106 (1999) Knox also fails to show how admitting Nancy Allison as a juror prejudiced his case. Allison's grandfather, tragically, had been murdered, but Allison testified that she could put aside her grandfather's murder, that she would place the burden of proof on the State to prove its case beyond a reasonable doubt, and, as Christian, that she would have difficulty impos-

ing the death sentence. She clearly expressed certain pro-defense stances that justify defense counsel's decision to accept her as a juror. Counsel's conduct did not therefore constitute "deficient performance," nor has Knox show he was prejudiced by Allison's admission as a juror.

Petitioner next complains of defense counsel's alleged ineffective assistance in failing to object or properly cross-examine Kathy Pressletz. However, as set out *supra*, defense counsel did properly cross-examine Pressletz and need not have objected to any of her testimony. Knox fails to show that Defense counsel was deficient or rendered prejudicial performance

■ Knox alleges that Defense counsel rendered ineffective assistance by failing to call Allen Thompson Jr. at the second trial to impeach George Holland. The record shows that the State called Holland at both trials to testify about his role as the driver of the get-away car in the robbery and murder. In the first trial, Defense counsel called Allen Thompson Jr., a cellmate of Holland's, to testify that Holland, on one occasion, had informed Thompson that Holland would receive a sentence of five years probation as part of a deal "or something." While Knox insinuates that the "deal" related to Holland's testimony in the instant case, Knox fails to point to any evidence of a deal. Thompson could have only testified that Holland had visited with someone prior to their conversation about a "deal" and returned with papers that Holland said pertained to the murder charges against him. In fact, Thompson testified that he never saw Holland with a member of the district attorney's office or papers indicating that the State had struck a deal with Holland. Further, Thompson never testified that Holland told him that the State offered him any plea agreement to testify in the instant case.

The record shows that Holland testified at both trials and that the State never offered him any deal for his testimony. The record in the second trial fails to reflect that Holland received any benefit in return for his testimony, as he received a two-year sentence and no probation for the murder charge. Because Thompson could not have definitely testified about a deal any more than Holland did, and because the record reflects that the State did not strike a "five-year probation" deal with Holland, Defense counsel did not render deficient or prejudicial performance in failing to call Allen Thompson, Jr. at the second trial.

■ Knox next alleges that Defense counsel should have objected to any improper bolstering of witnesses Morgan, Smith, and Pressletz, in the form of prior consistent statements offered by the State. The State asked Morgan, Smith, and Pressletz if they testified in the second trial as they did in the first to rebut an express or implied charge of recent fabrication. During cross-examination of Morgan and Smith at the second trial, Defense counsel impeached them by implying that they received a benefit for their testimony. Under Tex.R.Crim.Evid. 801(e)(1)(B), the State was entitled to offer prior consistent statements to rebut the express or implied charges of recent fabrication or improper influence since the prior statements were made before the motive to fabricate arose. Here, the first trial testimony of these witnesses took place before any plea bargain or sentencing of Morgan and Smith. With respect to Pressletz, the State properly redirected Pressletz regarding her prior consistent testimony as to the name of her true father, the property he owned, and the residence she shared with Knox, in response to Defense counsel's implied impeachment of that testimony in the second trial. Finally, Defense counsel's failure to object to the State's remark in closing argument that Holland had also testified consistently in a prior proceeding does not rise to the level of ineffective assistance. Regardless, with respect to all the witnesses, Knox fails to show how any of the alleged bolstering prejudiced his trial.

Lastly, Knox alleges that Defense counsel rendered ineffective assistance by failing to object to testimony from Smith that Knox and Morgan "did a job" after the robbery at Joe's pharmacy and from Pressletz that Knox had bragged to her about an alleged lynching in Vidor. First, neither admission was offered to prove the truth of the matter asserted. Smith's testimony at the guilt-innocence phase was offered to establish a timeline, and, regardless, the United States Court of Appeals for the Fifth Circuit has held that "implied references" to other offenses offered during the guilt-innocence phase do not rise to a level warranting habeas relief. *Lucas v. Johnson,* 132 F.3d 1069 (5th Cir. 1998). Pressletz's testimony at the punishment phase regarding Knox's stating that he had lynched a man in Vidor was offered not for the truth of the matter asserted, but rather to show probability of future danger. *See Williams v. Lynaugh,* 814 F.2d 205, 208 (5th Cir.1987). In this circumstance, admission of this testimony does not implicate the Sixth Amendment. Petitioner has therefore failed to show that Defense counsel's performance was deficient.

Accordingly, Petitioner's Ground Six is **DENIED.**

E. Ground 7:

Petitioner's conviction for capital murder and his sentence of death violate the due process clause of the Fourteenth Amendment because the State knowingly elicited, or allowed without correction, false testimony from George Holland and Carroll Bernard Smith to the effect that they had no deals with the State for their testimony, and failed to disclose to the defense prior to trial that such deals existed.

The final point of error urged by Knox is that the State suppressed evidence of deals it had made with Holland and Smith and allowed them to falsely testify that they had not received deals.

To obtain federal habeas relief based on this due process claim, Knox bears the burden of demonstrating that: (1) the state suppressed evidence, (2) that is favorable to the defense, and (3) material as to issues of guilt or punishment. *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963); *Brogdon v. Blackburn,* 790 F.2d 1164, 1167 (5th Cir.1986).

Knox fails to prove that the State suppressed evidence or offered perjured testimony knowingly or unknowingly. At both trials, Holland and Smith testified that they had no deals with the State in exchange for their testimony. Holland said if he testified and told the truth, the State had led him to believe it might have a bearing on his sentence for the same crime. Smith also testified at both trials that he had not struck a deal with the State in exchange for his testimony. During the state habeas proceeding, Smith said only that "I tell them what I know and hope like heck that when the time came that I did go to court, they would recognize it and they would not so much recognize, but—... they appreciate the help." Knox wholly fails to prove any evidence of a deal struck between the State and these witnesses. Further, statements from a prosecutor merely hinting at the possibility of future consideration for testimony are so marginal as to render them immaterial. *See Goodwin v. Johnson,* 132 F.3d 162, 187 (5th Cir.1997); *McCleskey v. Kemp,* 753 F.2d 877, 884 (11th Cir.1985).

In light of the record, the state habeas court's findings of fact and conclusions of law that the State: (1) made no deals with Holland or Smith, (2) did not fail to disclose offers made to Holland and Smith, (3) and did not offer false testimony, neither "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States; or ... resulted in a decision that was based on an unreason-

able determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(1), (2)

Accordingly, Petitioner's Ground Seven is **DENIED.**

## V. CONCLUSION

Based on the foregoing analysis and findings, the Court concludes that Petitioner has failed to show that he is entitled to federal habeas corpus relief. Accordingly, Petitioner's Petition for Writ of Habeas Corpus is **DENIED,** and Respondent's Motion for Summary Judgment is correspondingly **GRANTED.** All of Petitioner's claims are **DISMISSED WITH PREJUDICE.** The parties are **ORDERED** to file no further pleadings on this issues in this Court, including motions to reconsider or the like, unless justified by a compelling showing of new evidence not available at the time of the instant submissions. Instead, the parties are instructed to seek any further relief to which they feel themselves entitled in the United States Court of Appeals for the Fifth Circuit, as may be appropriate in due course.

**IT IS SO ORDERED.**

### *FINAL JUDGMENT*

For the reasons set forth in the Court's Order entered this date, Respondent's Motion for Summary Judgment is hereby **GRANTED.** Petitioner's Petition for Writ of Habeas Corpus is correspondingly **DENIED.** All of Petitioner's Claims are **DISMISSED WITH PREJUDICE.**

**THIS IS A FINAL JUDGMENT.**

**IT IS SO ORDERED.**

Keith JOHNSON, Individually, and All Other Similarly Situated Plaintiffs

v.

DIRECTV, INC.

No. CIV. A. G–99–415.

United States District Court, S.D. Texas, Galveston Division.

Sept. 21, 1999.

Cris A. Rasco, Dallas, TX, for Keith Johnson, Individually, and All Other Similarly Situated Plaintiffs.

Rodney Acker, Jenkens & Gilchrist, Dallas, TX, Andrew E. Paris, Kirkland & Ellis, Los Angeles, CA, for Directv, Inc., defendants.

### ORDER GRANTING MOTION TO REMAND

KENT, District Judge.

On June 10, 1999, Plaintiff filed this deceptive trade practices suit as a class action in the 239th Judicial District Court of Brazoria County, Texas. Defendants timely removed the case to this Court on July 12, 1999. Now before the Court is Plaintiff's Motion to Remand. For the reasons set forth below, this motion is **GRANTED.**

Defendant removed the case based upon diversity jurisdiction. The Court finds, however, that the requirements for diversity jurisdiction are not met because the amount in controversy does not exceed $75,000.

The parties do not dispute that there is complete diversity of citizenship between the Plaintiff and the Defendant. The Plaintiff is a citizen of the state of Texas, and the Defendant is a corporation organized and existing under the laws of the state of California, with its principal place of business in El Segundo, California.

The key issue in resolving the motion before the Court is whether the amount in controversy exceeds $75,000. As Defendant correctly noted in its Motion in Opposition to Remand, a defendant seeking removal bears the burden of persuading the Court, based on a *preponderance* of the evidence, that the amount in controversy is at least $75,000.[1]  *See Luck-*

---

1. In his motions before the Court, Plaintiff urged that the burden of persuasion imposed on a defendant seeking removal was to prove to a *legal certainty* that the amount in controversy exceeds $75,000. Plaintiff is mistaken. The "legal certainty" test is only appropriate when the amount in controversy is contested in an action *originally* commenced in federal court. *See St. Paul Mercury Indem. Co. v. Red Cab Co.,* 303 U.S. 283, 288–89, 58 S.Ct. 586, 590–91, 82 L.Ed. 845 (1938). In the Fifth Circuit, a preponderance standard is used in the removal context where plaintiff has alleged an indeterminate amount of damages.

Possibly Plaintiff's confusion derives from another source. In the removal context, once the removing defendant shows by a preponderance of the evidence that the requisite amount in controversy exceeds $75,000, the plaintiff can still defeat removal by showing

that, to a legal certainty, the amount in controversy does not exceed $75,000. See DeAg-

.uilar v. Boeing Co., 47 F.3d 1404, 1412 (5th Cir.1995).